**KANSAS CITY PREMIER APARTMENTS, INC.,**
Appellant,

v.

**MISSOURI REAL ESTATE COMMISSION,**
Respondent.

**No. SC 91125.**

Supreme Court of Missouri,
En Banc.

July 19, 2011.

Motion to Modify Denied Aug. 30, 2011.

David E. Roland, Freedom Center of Missouri, St. Louis, for Kansas City Premier Apartments.

Edwin R. Frownfelter, Attorney General's Office, Jefferson City, for Missouri Real Estate Commission.

ZEL M. FISCHER, Judge.

Kansas City Premier Apartments, Inc. ("KCPA") appeals an injunction entered by the trial court finding it in violation of chapter 339 and prohibiting it from continuing any activities requiring real estate licensure. KCPA claims that the trial court misapplied § 339.010.1, RSMo Supp. 2010.[1] It also claims that the trial court erred in not declaring § 339.010.1 and § 339.010.7 unconstitutional. This Court has exclusive jurisdiction over this appeal under article V, section 3, of the Missouri Constitution, as the appeal involves the validity of a state statute. Judgment affirmed.

**Facts**

In 2001, Tiffany Lewis and Ryan Gran founded KCPA, a business devoted to assisting owners of rental property in locating prospective renters ("prospects"). Neither Lewis nor Gran has a Missouri real estate brokerage license. KCPA's business model is built on entering into non-exclusive performance-based agreements with property owners. The property owners agree to pay a fee to KCPA for each new tenant who submits to the property owner a card verifying that he or she was referred to the property by KCPA. KCPA offers a $100 gift card to each prospect who gives a property owner a card that results in a payment to KCPA.

KCPA operates through its website, www.kcpremierapts.com. The website offers a searchable database of rental listings provided by property owners. It also offers prospects the option of direct, interactive contact with rental advisors. These advisors are independent contractors who will respond to any questions asked by prospects, recommend which properties to rent, and contact property owners to arrange appointments. The record shows that 80% of prospects take advantage of KCPA's rental advisors.

In 2004, the Missouri Real Estate Commission received a complaint about KCPA and began an investigation to determine if KCPA was unlawfully engaged in real estate activities. In 2006, the Commission sent Lewis a letter stating it had determined that KCPA was "conducting real estate activity without a Missouri real estate license ... in violation of Missouri law and must cease immediately."

In January 2007, KCPA responded, stating that it believed it was in compliance with the law. In March, the Commission sent another letter to KCPA insisting that it was "illegally operating as a real estate broker ... without the required Missouri real estate broker license." The letter threatened immediate legal action. In April, KCPA preempted the Commission by filing a lawsuit requesting a declaratory judgment that § 339.010.1 does not encompass its business activities, that

---

1. KCPA's challenge to the injunction is governed by the version of chapter 339 now in effect. *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 453 (Mo. banc 2011). "This is because an injunction looks forward by addressing what conduct or actions will be permitted in the future." *Id.* For this reason, all statutory references in this opinion are to RSMo Supp.2010.

§ 339.010.7 exempts KCPA from the licensure requirements of chapter 339, and that the Commission's interpretation of chapter 339 violates KCPA's rights under the United States and Missouri constitutions.

In 2009, after two years of litigation, the Commission filed its own petition for a preliminary injunction, seeking to bar KCPA from performing real estate activities. In 2010, the two cases were consolidated and tried. The trial court issued an injunction prohibiting KCPA from "[c]ontracting with property owners to receive compensation in return for referring prospective tenants" and from performing "any act requiring real estate licensure." It also prohibited KCPA from dispensing rebate cards to tenants and denied KCPA's request for declaratory judgment.

### Application of § 339.010

KCPA challenges the trial court's judgment claiming that it erroneously applied § 339.010. KCPA claims that while it meets the definition of a "real estate broker" under § 339.010.1, it qualifies for an exemption under § 339.010.7.

### Standard of Review

■ This Court must sustain the trial court's judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

### Analysis

Section 339.010.1 defines a "real estate broker" as a person or corporation who for valuable consideration does or attempts to do any of the following:

(3) Negotiates or offers or agrees to negotiate the sale, exchange, purchase, rental or leasing real estate;

(4) Lists or offers or agrees to list real estate for sale, lease, rental or exchange;

. . . . .

(7) Assists or directs in the procuring of prospects, calculated to result in the sale, exchange, leasing or rental of real estate;

(8) Assists or directs in the negotiation of any transaction calculated or intended to result in the sale, exchange, leasing or rental of real estate;

. . . . .

(10) Performs any of the foregoing acts on behalf of the owner of real estate, or interest therein, or improvements affixed thereon, for compensation.

§ 339.010.1. Section 339.020 makes it unlawful for any person or corporation to act as a real estate broker without a license, and a violation is a class B misdemeanor. Section 339.170.

KCPA argues the trial court's judgment erroneously applies these provisions because KCPA is retained by landlords to list and otherwise assist them in marketing their rental properties and, therefore, it qualifies for an exemption from the chapter 339 licensure requirements under § 339.010.7(5). Section 339.010.7(5) states that the provisions of chapter 339 do not apply to:

[a]ny person employed or retained to manage real property by, for, or on behalf of the agent or the owner of any real estate shall be exempt from holding a license, if the person is limited to one or more of the following activities:

(a) Delivery of a lease application, a lease, or any amendment thereof, to any person;

(b) Receiving a lease application, lease, or amendment thereof, a security deposit, rental payment, or any related payment, for delivery to, and made payable to, a broker or owner;

(c) Showing a rental unit to any person, as long as the employee is acting under the direct instructions of the broker or owner, including the execution of leases or rental agreements;

(d) Conveying information prepared by a broker or owner about a rental unit, a lease, an application for lease, or the status of a security deposit, or the payment of rent, by any person;

(e) Assisting in the performance of brokers' or owners' functions, administrative, clerical or maintenance tasks....

KCPA argues that because the statute does not define what it means for a person to be "employed or retained to manage real property," the term "retain" must be given its ordinary meaning as found in the dictionary. *In re Coffman,* 225 S.W.3d 439, 444 (Mo. banc 2007). It relies on the BLACK'S LAW DICTIONARY 1316 (6th ed.1990) definition of "retain," which is "to engage the services of an attorney or counselor to manage a specific matter." Based on this definition, KCPA argues that it is retained by property owners to list and otherwise assist them in marketing their rental properties; therefore, it qualifies for the exemption given under § 339.010.7(5).

■ KCPA's broad interpretation of the § 339.010.7(5) exemption ignores the plain and ordinary meaning of the statute and the intent of the legislature. "The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Howard v. City of Kansas City,* 332 S.W.3d 772, 779 (Mo. banc 2011). "Exemptions are interpreted to give effect to the General Assembly's intent, using the plain and ordinary meaning of the words." *Brinker Missouri, Inc. v. Dir. of Revenue,* 319 S.W.3d 433, 437 (Mo. banc 2010).

This Court has previously found that "the manifest intention" of the legislature in enacting chapter 339 was "to protect the public from the evils of fraud and incompetency." *Miller Nationwide Real Estate Corp. v. Sikeston Motel Corp.,* 418 S.W.2d 173, 176–77 (Mo.1967). Therefore, KCPA "must present a clear case, free from all doubt" that it fits under an exemption from chapter 339, and any such exemption "must be strictly construed against [it] ... and in favor of the public." *Id.* at 177.

■ KCPA has failed to meet this burden. KCPA's interpretation of the exemption under § 339.010.7(5) ignores the language limiting the activities that can be performed by an unlicensed person "employed or retained to manage real property ... to one or more of the ... activities" listed in subsections (a) through (e). Section 339.010.7(5). Of these subsections, § 339.010.7(5)(d) is most applicable to the activities performed by KCPA. This subsection allows the "[c]onveying [of] information prepared by a broker or owner about a rental unit, a lease, an application for lease ... by any person." Section 339.010.7(5)(d). However, KCPA's activities are not limited enough to fit under this exemption. KCPA provides other services that exceed all of the exemptions provided by § 339.010.7, such as providing rental advisors who market select units to prospects based on the prospect's particular needs and providing detailed advice about apartment search strategies. Because none of the exemptions applies to this type of assistance, KCPA cannot rely on any of the exemptions.

### Constitutional Validity of § 339.010

KCPA challenges the constitutional validity of § 339.010.1(3), (4), (7), (8), and (10) and § 339.010.7.

## Standard of Review

 This Court reviews a constitutional challenge to a statute *de novo*. *In re Brasch*, 332 S.W.3d 115, 119 (Mo. banc 2011). "A statute is presumed valid and will not be held unconstitutional unless it clearly contravenes a constitutional provision. The person challenging the statute's validity bears the burden of proving the act clearly and undoubtedly violates the constitution." *Id.*

## Freedom of Speech under the United States Constitution

KCPA argues that the challenged provisions should be struck down because they dramatically impair the ability of unlicensed persons to share knowledge about real estate and limit a potential renter's ability to receive this knowledge. KCPA essentially asserts that the State should not be able to license and regulate people who choose to perform real estate activities in Missouri. In making this assertion, KCPA offers no case law that stands for the proposition that a state cannot regulate professional conduct because it violates the constitutional right to freedom of speech.[2]

If KCPA merely wanted to advertise or provide information, as suggested by the dissenting opinion, it would be exempt from regulation by the Commission. Further, the terms of the circuit court's judgment do not enjoin providing information, which would be considered protected commercial speech. In fact, the dissenting opinion suggests that this Court, rather than accepting the findings and conclusions of the circuit court, should reweigh the evidence and re-find the facts and re-conclude that KCPA merely "communicat[ed] to the public information about the availability of rental housing." Op. at 175. The findings and conclusions of the circuit court indicate that KCPA did much more than provide information and, in fact, crossed over the line into activities limited to those that the legislature has determined require a real estate license. These determinations are supported by substantial evidence and should be given due deference. In fact, many of these activities were not denied by KCPA.

There are, however, numerous cases that have upheld the regulation of professional conduct even if that conduct takes the form of speech. In *Ohralik v. Ohio State Bar Ass'n*, the United States Supreme Court addressed whether the Ohio State Bar Association could discipline an attorney for personally soliciting automobile accident victims, or whether this conduct was a protected exercise of that attorney's right to free speech. 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). The Supreme Court found that Ohio did not lose the ability to regulate commercial activity to protect the public simply because speech was a component of that activity. *Id.* at 456, 98 S.Ct. 1912. The Supreme Court also found that there was no need for proof that Ohralik's conduct actually harmed the public for Ohio to regulate it; all that was necessary was the potential for harm. *Id.* at 464, 98 S.Ct. 1912. Ulti-

---

2. KCPA cites to *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), which declared unconstitutional a regulation that prevented licensed pharmacists from disseminating any information regarding the prices of prescription drugs. *Id.* at 756, 96 S.Ct. 1817. However, in doing so, the Supreme Court held only that a state could not completely suppress commercial speech but did not address to what extent commercial speech could be regulated. *Id.* at 771, 96 S.Ct. 1817. It is also important to note that this case is further distinguishable from the current case because it dealt with the regulation of the commercial speech of persons licensed under the regulation in question.

mately, the Supreme Court found that the regulation of the practice of law in Ohio is "within the State's proper sphere of economic and professional regulation" and, therefore, "is subject to regulation in furtherance of important state interests." *Id.* at 459, 98 S.Ct. 1912.

Many other courts have reached a similar conclusion to that in *Ohralik,* finding that the regulation of professions is necessary to protect the public and, therefore, is not unconstitutional simply because the regulations had an incidental effect on the free speech rights of unlicensed individuals. Courts have upheld the regulation of professionals such as psychologists, *National Ass'n for the Advancement of Psychoanalysis v. California Bd. Of Psychology,* 228 F.3d 1043 (9th Cir.2000), securities broker-dealers, *Underhill Associates, Inc. v. Bradshaw,* 674 F.2d 293 (4th Cir.1982), accountants, *Accountant's Soc'y of Virginia v. Bowman,* 860 F.2d 602 (4th Cir. 1988), and, most recently, interior designers, *Locke v. Shore,* 634 F.3d 1185 (11th Cir.2011).

■■ A state, however, does not have unlimited power to directly restrict speech through the regulation of a profession. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 770, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Instead, to the extent that specific provisions of a regulatory scheme directly restrict speech, those provisions must survive either strict scrutiny or intermediate scrutiny standard. In determining which standard to apply, the United States Supreme Court has recognized a " 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 562, 100 S.Ct. 2343, 65

L.Ed.2d 341 (1980) (quoting *Ohralik,* 436 U.S. at 455–56, 98 S.Ct. 1912). For this reason, the lesser standard of intermediate scrutiny applies to state regulations of commercial speech. *Id.* at 562–63, 100 S.Ct. 2343.

■■ The information KCPA displays as part of its real estate activities is commercial speech. Commercial speech, as defined in *Central Hudson,* is an "expression related solely to the economic interests of the speaker and its audience." *Id.* at 561, 100 S.Ct. 2343. The information that KCPA displays serves its economic interest in that it gets paid when a prospect chooses one of the rental properties it advertises. The information also serves KCPA's prospects' economic interest by helping them find the rental that best fits their needs and by providing them with the additional incentive of a $100 gift card for using KCPA's services. Because chapter 339 only regulates commercial speech, this Court's review of the challenged provisions must apply the four-part intermediate scrutiny test as described in *Central Hudson.* *Id.* at 566, 100 S.Ct. 2343.

■ In the first part of the *Central Hudson* test, this Court "must determine whether the expression is protected by the First Amendment." *Id.* "For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading." *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. If this Court determines that the speech in question is protected by the First Amendment, then it must determine "whether the asserted governmental interest is substantial." *Id.* If the governmental interest is substantial, this Court must "determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.*

■ Assuming the information displayed on KCPA's website is lawful and not misleading, this Court must determine whether the Commission has asserted a substantial governmental interest. The governmental interest behind the challenged provisions is to protect the public from fraud and incompetence. *Miller Nationwide*, 418 S.W.2d at 176–77. Because this is a substantial governmental interest, this Court must perform the next step as described by *Central Hudson* to determine if the challenged provisions survive intermediate scrutiny. 447 U.S. at 566, 100 S.Ct. 2343.[3]

■ Intermediate scrutiny requires compliance with two criteria:

First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.

*Id.* at 564, 100 S.Ct. 2343. Chapter 339 and the challenged provisions meet the requirement of directly advancing a state interest. The requirements of licensure directly relate to the honesty and competency that the legislature seeks to assure in those who practice real estate in this state.

Chapter 339 is also not excessive. In *Central Hudson*, the Supreme Court defined the second requirement of intermediate scrutiny as allowing "the regulatory technique [to] extend only as far as the interest it serves." *Id.* at 565, 100 S.Ct. 2343. A state cannot reach beyond its interest and regulate speech that poses no danger to that state's interest. *Id.* The restrictions imposed by chapter 339 and the challenged provisions do not go beyond the State's interest in regulating "real estate brokers" as described by the definition in § 339.010.1. Because the challenged provisions survive immediate scrutiny, they do not violate KCPA's freedom of speech and are not unconstitutional.

## Freedom of Speech under the Missouri Constitution

■ KCPA asserts that even if the challenged provisions do not violate the right to freedom of speech under the United States Constitution, these provisions still violate the right to freedom of speech under the Missouri Constitution. KCPA claims that the right to freedom of speech under article I, section 8, of the Missouri Constitution is broader than the federal right.[4] It claims that the article I, section

---

**3.** This case does not involve the combination of both "content based" and "speaker based" speech that was present in *Sorrell v. IMS Health*, 564 U.S. ——, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011), relied on by the dissenting opinion to justify applying heightened scrutiny. "Heightened scrutiny" has not in the past and is not likely in the future to be expanded to all commercial speech because to do so would significantly change the legislative/judicial balance in a way that significantly weakens the legislature's authority to regulate commerce and industry. Traditionally, commercial speech can be subject to greater governmental regulation than noncommercial speech because of the government's neutral interest in preventing commercial harms. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). The speech-related consequences here are incidental, and if KCPA would limit its activity to the speech-related activity, it would not be subject to regulation by the Commission.

**4.** "While provisions of our state constitution may be construed to provide more expansive protections than comparable federal constitutional provisions, analysis of a section of the federal constitution is strongly persuasive in construing the like section of our state constitution." *Doe v. Phillips*, 194 S.W.3d 833, 841 (Mo. banc 2006) (internal quotations omitted).

8, requires the Commission to demonstrate why KCPA's communications of information about rental properties should be considered an "abuse" of its expressive freedoms.

■ This Court addressed a similar argument in *Missouri Libertarian Party v. Conger*, 88 S.W.3d 446 (Mo. banc 2002). In *Conger*, this Court disagreed with the argument that the right to free speech under article I, section 8, was so broad that it granted an absolute right to speech without restriction. *Id.* at 447–48. Instead, this Court held that "[t]he right to free speech is subject to the state's inherent right to exercise its police power." *Id.* at 448. This Court has previously held that chapter 339 serves an important purpose and is a proper exercise by the State of its police power. *Miller Nationwide*, 418 S.W.2d at 177. Therefore, chapter 339 does not violate the right to freedom of speech under article 1, section 8, of the Missouri Constitution.

### Equal Protection Clause of the United States and Missouri Constitutions

■ KCPA argues § 339.010.7 violates the equal protection clause [5] and article I, section 2, of the Missouri Constitution because it arbitrarily discriminates by creating exemptions "not based on differences reasonably related to the purposes" of the statute. *Petitt v. Field*, 341 S.W.2d 106, 109 (Mo. banc 1960). Both the equal protection clause and article I, section 2, provide "that a law may treat different groups differently, but it cannot treat similarly situated persons differently without adequate justification." *Comm. for Educ. Equal. v. State*, 294 S.W.3d 477, 489 (Mo.

banc 2009). Whether adequate justification exists is determined by applying either strict scrutiny if a "fundamental right" is impacted by the law or rational-basis review if one is not. *Id.* at 489–90. No fundamental right exists to engage in the profession of real estate brokerage, so this Court will review chapter 339 under the rational-basis standard.

■ Rational-basis review requires that this Court find a "reasonably conceivable state of facts that ... provide[s] a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Review under this standard is not an opportunity for this Court to question "the wisdom, fairness, or logic of legislative choices." *Id.* Instead, all that is required is that this Court find a plausible reason for the classification in question. *Id.* at 313–14, 113 S.Ct. 2096.

■ Plausible reasons exist for the exemptions provided by § 339.010.7. The persons exempted from the licensure fall into four general categories; all of these persons have a plausible reason for being exempt. The first category includes persons acting on their own behalf, with regard to property under their legal control. This first category is created by § 339.010.7(1), (3), (5), (7), (10), and (12), which allows exemptions for property owners and their employees, auctioneers, property managers retained by owners, railroads and other public utilities, developers, and neighborhood associations, respectively. The plausible reason for these exemptions is to allow these persons to handle their own affairs without having to hire a

This Court has traditionally given due deference to United States Supreme Court precedents when our state constitutional provisions are the same as the United States constitutional provisions.

5. "No State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amendment XIV, § 1.

real estate broker. The second category is encompassed by § 339.010.7(2) and is limited to attorneys. The exemption of attorneys is rational because each attorney has been licensed professionally and is regulated by this Court and, therefore, does not need to be governed by chapter 339. The third category is made up of persons who have the authority of law to deal in land transactions. These persons are covered by § 339.010.7(4), (6), and (11) and consist of receivers, trustees, guardians, or executors; federal, state or local government employees; and employees of nonprofit organizations engaged in economic development. It is rational for the legislature to think that the persons in this category do not need to be regulated under chapter 339 because they already act in an official capacity under the authority of law. The fourth and final category consists of newspaper publishers and other representatives of media. They are exempted under § 339.010.7(9) as long as their advertising of real estate is incidental to their operation. This exemption is reasonable in that it allows newspapers and other media sources to continue to post classified advertisements for real estate. Because all the exemptions under § 339.010.7 have a reasonably conceivable rational basis, they do not violate the equal protection clause or article I, section 2, of the Missouri Constitution.

### Special Law Provision of the Missouri Constitution

KCPA claims that § 339.010.7 violates article III, section 40(30), of the Missouri Constitution because it is a special law. Article III, section 40(30), prohibits the legislature from passing any special law "where a general law can be made applicable, and whether a general law could have been made applicable is a judicial question to be judicially determined without regard to any legislative assertion on that sub-

ject." This Court has previously recognized that "whether a law is special or general can most easily be determined by looking to whether the categories created under the law are open-ended or fixed, based on some immutable characteristic." *City of Springfield v. Sprint Spectrum, L.P.*, 203 S.W.3d 177, 184 (Mo. banc 2006).

██ Chapter 339 classifies persons based on whether they are licensed real estate brokers. Section 339.040 provides a framework for how a person can become a licensed real estate broker. Many of the exemptions described in § 339.010.7 are also open-ended—a person can become a licensed attorney or an auctioneer, for example. For this reason, § 339.010.7 is not a special law in violation of article III, section 40(30).

### Vagueness

KCPA's final argument is that § 339.010.1(3), (4), (7), (8), and (10) and § 339.010.7 are unconstitutionally vague. It avers that the legislative definition of the practice of "real estate brokerage" is so vague that it violates due process.

██ "Due process requires that all be informed as to what the State commands or forbids, and that men of common intelligence not be forced to guess at the meaning of the criminal law." *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (internal quotations omitted). This Court has reviewed vagueness challenges to the language of a statute "by applying it to the facts at hand." *State v. Entm't Ventures I, Inc.*, 44 S.W.3d 383, 386 (Mo. banc 2001). "A valid statute provides a person of ordinary intelligence a reasonable opportunity to learn what is prohibited." *Id.*

██ The words used in the challenged provisions are not vague; the con-

duct prohibited is defined clearly. The words and phrases that KCPA challenges such as "negotiates," "listing," and "assists or directs in the procuring of prospects for rental" have everyday meanings. "[I]f the words or terms used in the statute are of common usage and are understandable by persons of ordinary intelligence they will satisfy the constitutional requirement as to definiteness and certainty." *State v. Williams*, 473 S.W.2d 382, 384 (Mo. banc 1971). Applying these statutes to the facts at hand, the prohibitions of chapter 339 are easily understood. These statutes gave KCPA adequate notice that it was acting in violation of chapter 339 by assisting and directing in the procuring of prospects for rental.

### Conclusion

KCPA has failed to demonstrate that the trial court erroneously declared or applied the law by entering an injunction against KCPA. It also has failed to demonstrate that the challenged provisions are unconstitutional. The judgment is affirmed.

RUSSELL, BRECKENRIDGE, STITH and PRICE, JJ., concur.

WOLFF, J., dissents in separate opinion filed.

TEITELMAN, C.J., concurs in opinion of WOLFF, J.

MICHAEL A. WOLFF, Judge, dissenting.

### Introduction

Kansas City Premier Apartments (KCPA) is enjoined from conveying truthful information through its website and through its "rental advisors" to potential renters who are in the market for apartments. KCPA does so for a fee, paid by the property owners to whom prospective tenants are referred, but this fee does not justify the state's suppression of KCPA's distribution of this information.

The circuit court's injunction against KCPA's speech, upheld in the principal opinion, runs afoul of the First Amendment, as applied by the United States Supreme Court in a variety of commercial contexts, including the Supreme Court's June 23 decision in *Sorrell v. IMS Health*, 564 U.S. ——, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011).

One can plausibly disagree with the United States Supreme Court's unbending rationale in recent cases on free speech, but this court's duty is to apply the principles of these cases, not to pay homage to them while disregarding them. Because I can find no principled distinction between this case and the First Amendment principles set forth most recently in *Sorrell*, I respectfully dissent.

*Sorrell* struck down a Vermont law that forbade the sale of prescriber-specific information by pharmacies to "pharmaceutical manufacturers and pharmaceutical marketers." Vt. Stats. Ann., section 4631(f) (2010). It is common practice in the pharmaceutical industry for so-called "data mining" companies to buy information from pharmacies and then sell the information to pharmaceutical companies to use in refining their drug marketing to prescribing physicians. The Supreme Court rejected Vermont's explanation that it was intended to protect public health and keep health care costs in check, saying that the law could not withstand "heightened scrutiny." The Supreme Court found that heightened scrutiny was the appropriate standard of review because the Vermont law was a content-based—only forbidding the marketing of drugs—and a speaker-based—only silencing pharmaceutical marketers and manufacturers—prohibition on speech. The Supreme Court

held that the speech's commercial nature did not negate the need for heightened scrutiny because "[w]hile the burdened speech results from an economic motive, so too does a great deal of vital expression." 564 U.S. at —, 131 S.Ct. at 2665.

Like the regulation in *Sorrell*, here there is no evidence that the speech is false or misleading. The prohibition of marketing is content-based and speaker-based, as in *Sorrell*, justifying heightened scrutiny. By restricting the advertisement of rental properties to only licensed real estate agents, the state of Missouri has enacted content-based—only the listing, or advertising of rentals and homes is forbidden—and speaker-based—only non-licensed persons are prohibited from speaking—restrictions on speech. This case is directly parallel to the factual situation in *Sorrell*. As in *Sorrell*, heightened scrutiny is appropriate, and the state's regulation cannot survive such scrutiny.[1]

The speech activities of KCPA are commercial, to be sure, but they are deemed worthy of First Amendment protection. Its activities are unadorned speech, not shown to be harmful or untruthful. The state has no business suppressing this speech under its police power to regulate occupations, and the broad injunction that the Court upholds in the principal opinion violates the First Amendment.

### Occupational licensing

When KCPA challenges state suppression of its economic activities, its free speech theory seems but a proxy for its real challenge—the denial of economic liberty by a state-created cartel for marketing real estate services. The Missouri legislature has seen fit to limit "real estate activities" to licensed real estate agents,[2] thus creating a cartel.[3] *See* section 339.010 RSMo Supp 2010.[4] By requiring occupational licensing in the real estate profession, the Missouri legislature has limited the abilities of Missourians to make a living.[5]

The occupation of real estate agent is but one of the scores of occupations the state has seen fit to regulate from the early 20th century forward. Prior to that time, there were recognized but three "professions"—the ministry, law and medicine—and regulation was confined to the latter two. But the scores of regulatory

---

1. The Supreme Court went on in *Sorrell* to find that none of the government's justifications—protection of medical privacy, integrity of the doctor-patient relationship, and improved public health and reduced healthcare costs—were advanced by the regulation. *Sorrell*, 564 U.S. at —, 131 S.Ct. at 2668. Instead, the Court held that the State's burdening of speech rested on "nothing more than a difference of opinion" as to the value of particular types of speech. *Id.* at —, 131 S.Ct. at 2672.

2. This opinion uses the term "real estate agents" to refer to both real estate salespersons and real estate brokers as defined in section 339.010.

3. A cartel is "an association of firms with common interests, seeking to prevent extreme or unfair competition, allocate markets or

share knowledge." BLACK'S LAW DICTIONARY, 207 (7th ed.1991).

4. All statutory references are to RSMo Supp 2010 unless otherwise indicated.

5. Among the requirements for becoming licensed is that the person be of "good moral character," "good reputation for honesty, integrity, and fair dealing," and "competent to transact the business of a broker or salesperson in such a manner to safeguard the interest of the public." *See* section 339.040. And, of course, that the person pay a fee. Section 338.040.4. These fees range from $40 to $150 to obtain a license and another $56 to take the licensing examination. Real Estate Commission, *Fees, available at* http://pr.mo. gov/boards/realestate/fees.pdf (last visited June 29, 2011).

statutes that have been enacted—usually at the behest of the regulated occupations—have some have some tangential relation to protection of the public and quite a direct relation to protection of the economic interests of members of the occupation group. These occupational licensing provisions can be analogized to the merchants' guilds of medieval times. Both economic systems serve to decrease competition by restricting access to the occupation, restricting non-members from participating in economic markets, and attaching legal consequences to "essentially determinations of what are ethically or economically permissible practices." Walter Gellhorn, INDIVIDUAL FREEDOM AND GOVERNMENTAL RESTRAINT 114(1956).

The constitution does not explicitly protect economic liberty, which may come as a surprise to those who skipped high school civics, but the constitutional guarantee of free speech often is invoked to fill the seemingly un-American void.[6] The connection between free speech and free enterprise is direct. When describing the necessity of protecting commercial speech, the Supreme Court explained that "so long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intel-

ligent and well informed. To this end, the free flow of commercial information is indispensable." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

### Limiting the Flow of Information

KCPA's free-speech theory is based on government suppression of truthful information about the availability of apartments for rent, information that is provided for a fee collected from landlords who obtain tenants for their properties through KCPA. The information KCPA provides serves a necessary function in our economy by providing consumers with information necessary to make rational decisions about their real estate rentals. By channeling all such information through licensed real estate agents, the state is limiting the information provided, creating an incentive to skew the information to the consumer to help close the deal.

Truthful, non-misleading commercial speech is protected by the First Amendment. In order to regulate this speech, the state must adduce a substantial justification for regulation; that the regulation directly advances the governmental interest asserted; and whether it is no more extensive than necessary to advance the stated governmental interest. *Cent. Hud-*

---

**6.** Though the federal constitution does not refer to economic freedom, the Missouri Constitution's Bill of Rights includes protection for the right of the people "to the enjoyment of the gains of their own industry." Mo. CONST. art. 1 sec. 2. *Fisher v. State Highway Comm'n of Mo.*, 948 S.W.2d 607, 613 (Mo. banc 1997), read the provision, enacted in the 1865 constitution, very narrowly to apply to recently freed slaves and a prohibition of slavery. Judge Holstein, joined in dissent by Judge Price, had the better view-that a "negligent taking by the State of one's fundamental, constitutionally protected liberty and property right to engage in lawful employment is pro-

hibited absent payment of just compensation or other due process of law." *Id.* It seems farfetched to argue, as did the majority in *Fisher*, that article 1, section 2, which had been re-adopted in the constitutions of 1875 and 1945 and has persisted for the past 146 years, should be confined in contemporary times to discouraging or outlawing slavery. For our present purposes, it should suffice to note that an infringement of the right to pursue a lawful occupation should be evaluated by the same kind of heightened scrutiny that the United States Supreme Court applies to infringements on the right of free speech.

*son Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

The threshold question, therefore, is whether KCPA's conduct is speech, and, if so, whether the speech is commercial speech. The activity at issue is KCPA's advertisement of rental properties to the consumer. The Supreme Court has held that advertising is a form of speech. *See Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (finding that newspaper advertising of an abortion clinic's referral services was speech); *Cent. Hudson,* 447 U.S. at 557, 100 S.Ct. 2343 (finding that advertising of utility prices is speech). Neither party here disputes that KCPA's conduct is commercial speech—which is protected under the First Amendment. *Bigelow,* 421 U.S. at 809, 95 S.Ct. 2222.

The state argues that the occupational licensing governs primarily conduct and that any suppression of speech is purely incidental.[7] The circuit court's overly broad judgment enjoined KCPA from:

A. Contracting with property owners to receive compensation in return for referring prospective tenants who rent from property owners, which is not an enforceable contract under the terms of Section 339.160, RSMo;

B. Any act requiring real estate licensure pursuant to the terms of Chapter 339, RSMo.

The circuit court judgment does not specify how KCPA violated chapter 339, leading to its broad injunction. The court concluded that: "KCPA's business activities do not include collecting rents or security deposits for owners. KCPA does not accept money directly from renters or prospective renters and does not handle tenant complaints for owners or managers of rental properties. KCPA does not 'show' properties to prospective renters through actual in-person inspection. It does not advertise or hold itself out as licensed real estate broker or salesperson. KCPA does not charge or accept advance fees for advertisements appearing on KCPA website."

Although the circuit court did not specify how KCPA acted as a real estate agent, the court concluded that it performed acts requiring licensure and enjoined KCPA from doing the activities quoted here, because as the court concluded that KCPA violated the following sections:

(1) 339.010(3)—negotiates or offers or agrees to negotiate the sale, exchange or purchase, rental or leasing of real estate;

(2) 339.010(4)—lists or offers or agrees to list real estate for sale, lease, rental or exchange;

(3) 339.010(7)—assists or directs in the procuring of prospects, calculated to result in the sale, exchange, renting, or leasing of real estate; and

(4) 339.010(8)—assists or directs in the negotiation of any transaction calculated or intended to result in the sale, exchange, or rental or real estate.

A court as well could conclude, as this Court should, that KCPA did not violate chapter 339 by acting as a real estate agent—by negotiating the purchase, sale or rental of real property but instead, by simply communicating to the public information about the availability of rental housing. This is indistinguishable from the advertising previously held to be speech. *See Bigelow,* 421 U.S. at 809, 95

---

7. The state's argument fails because KCPA is not challenging the state's right to license real estate salespersons and brokers but instead the state's restriction on KCPA's communication to consumers.

S.Ct. 2222. This case differs from federal cases holding that blanket regulation of occupations are permissible under the First Amendment because any free speech restrictions are merely incidental. *See, e.g., Accountant's Soc'y of Virginia v. Bowman,* 860 F.2d 602 (4th Cir.1988); *Nat'l Ass'n for the Advancement of Psychoanalysis v. California Bd. of Psychology,* 228 F.3d 1043 (9th Cir.2000).

KCPA is not challenging the ability of the state to license an occupation, just the lawfulness of its restricting communication of housing opportunities in the greater Kansas City area. The key to distinguishing between occupational regulation and First Amendment restriction of speech is whether there is a "personal nexus between professional and client." *Lowe v. S.E.C.,* 472 U.S. 181, 211, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) (White, J., concurring). This personal nexus occurs when a professional "takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances...." *Id.* at 232, 105 S.Ct. 2557. For example, the Fourth Circuit held that accountants, by preparing individualized assessments of their clients' financial situations, were exercising their professional judgment on their clients' behalf, creating a personal nexus between client and professional. *Accountant's Soc'y of Virginia,* 860 F.2d at 602. Here, however, KPCA is not exercising professional judgment on behalf of its clients but merely is communicating information about available rentals.

Testimony from prospective tenants shows instances in which the KCPA "rental advisors" expressed personal opinions about properties listed on the website and rendered advice to prospective tenants about how they should approach negotiation with property owners, but none of this information was proved to be harmful to the public or the prospective tenants.

The state can completely restrict "false or misleading" speech as well as speech proposing an illegal activity. *Peel v. Attorney Registration and Disciplinary Com'n of Illinois,* 496 U.S. 91, 100, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990); *Cent. Hudson,* 447 U.S. at 557, 100 S.Ct. 2343.

The circuit court in this case found that the state did not prove that any of the property advertisements on the KCPA website were false or misleading. The state argues that because KCPA's speech violates chapter 339, it is illegal and, therefore, does not fall under the protection of the First Amendment. This argument goes in a circle: The speech-restricting statute makes KCPA's conduct illegal, without that statute it would be legal speech, and, therefore, KCPA's speech is not advocating speech that is illegal under a separate statute, but speech that is made illegal by the speech-restricting statute being challenged.[8] But the bottom line is that KCPA's speech is not shown to be false or misleading, or advertising an illegal product or activity—it is simply speech protected by the First Amendment.[9]

"The party seeking to uphold a restriction on commercial speech carries the bur-

---

**8.** *Compare with Pittsburgh Press Co. v. Human Rel. Comm'n,* 413 U.S. 376, 385, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (holding that there was no First Amendment protection for newspaper to carry help-wanted ads in sex-designated columns). In this case, the underlying activity being advertised for—prostitution—was illegal. The advertisement itself

was not. Here, the underlying activity—advertising real estate—is not illegal.

**9.** *Central Hudson* provides the appropriate analysis to determine whether a regulation on commercial speech violates the First Amendment:

If the communication is neither misleading nor related to unlawful activity, the govern-

den of justifying it." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 71, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). The state must show that the harms it recites are valid and that the restriction will alleviate them to a material degree. *Edenfield v. Fane*, 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). The government argues that chapter 339 serves a substantial government interest in preventing fraud and incompetence by persons engaged in the marketing of real estate. There is no question that the prevention of fraud is a substantial interest. *Id.* at 769–79, 113 S.Ct. 1792. To the extent that "competency" involves assuring that information is truthful, that might be an interest of the state. But, under *Sorrell* and the cases leading up to *Sorrell*, the state's interest does not justify its suppression of KCPA's speech.

Not only must the interest be substantial but the proposed government regulation also must materially and directly advance that interest and be no more extensive than necessary to serve that interest. *Edenfield*, 507 U.S. at 773, 113 S.Ct. 1792. The state argues that the licensing criteria protect the public by assuring the honesty and good behavior of brokers and agents. The state has not shown a nexus between truthful advertising and forbidding unlicensed realtors from advertising. "The States may not place an absolute prohibition on certain types of potentially misleading information, *e.g.*, a listing of areas of practice, if that information may be presented in a way that is not deceptive." *In re R.M.J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). Here, the state could ban false or deceptive advertising from all persons—licensees or not—advertising real estate. Instead, it chose to enact chapter 339, forbidding all those not licensed from advertising. The state has not shown any studies or anecdotal evidence illustrating that having a license prevents fraud and deception. *See Edenfield*, 507 U.S. at 761, 113 S.Ct. 1792 (declaring a ban on in-person solicitation by CPAs is unconstitutional after the state adduced no studies or even anecdotal evidence showing there was a relationship between fraud and overreaching and the solicitation ban).

The state's main argument in this case is that licensure is necessary to provide a background in "the subtleties of agency, conflicts, fiduciary duties, fair housing laws, discrimination issues, and other questions in which licenses real estate professionals are trained." The state argues that this information is necessary for KCPA to render advice to their clients. For example, the state quotes Andrea Huff—a KCPA "rental advisor"—as telling a prospective tenant, "I have a few favorites ... I really like Sandstone Creek with Enclave and The Crescent to be my last choices for the overland park area (sic) ... they're fine just not quite as new and update (sic) as the others." The state argues that she only gave this advice be-

ment's power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State's goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive. *Cent. Hudson*, 447 U.S. at 564, 100 S.Ct. 2343.

cause of Ms. Huff's lack of knowledge of fiduciary principles, although it is not clear whose fiduciary she would be. This example may illustrate a point opposite to the state's point—the importance of allowing unlicensed realtors to convey information about rental listings. The rental advisor may be giving a valuable opinion that a licensed real estate agent would not give— that a particular property was not the most suitable for the prospective renter.

The state also argues two instances in which the information given by a rental advisor was inappropriate because the advisor advocated lying to the apartment complex, in one instance, lying about the weight of the dog owned by a prospective tenant where the apartment owner limited rentals to owners of small dogs but did not weigh them. Putting aside the question of whether lying about the weight of one's dog is a proper rationale for occupational licensing, I would hasten to point out that if a rental advisor advocates false, deceptive or unethical information, the solution is not to limit all speech but to ban false, deceptive or misleading speech. *See In re R.M.J.*, 455 U.S. at 203, 102 S.Ct. 929 (holding that misleading advertising may be prohibited entirely, but the state may not place an absolute prohibition on certain types of potentially misleading information, e.g., a listing of areas of law practice, if the information may be presented in a way that is not deceptive).

"The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). This is what the state seems to be doing in this case. By providing licensed real estate agents with a government-sanctioned cartel or monopoly on realty information, it is limiting the quality and quantity of information provided to consumers. The state's paternalistic view that only licensed real estate agents somehow possess accurate and valid information may be insulting to consumers and unlicensed persons but that is not the point— the point is that the regulation violates the First Amendment. To that end, KCPA should not be censored by the government and should be allowed to communicate information to potential customers about the availability and characteristics of apartments.

### Conclusion

I would reverse the judgment of the circuit court and remand. If the state wants an injunction limited only to the use of false or deceptive information, the state may be able to make the required showing. But the broad prohibition of this injunction violates the First Amendment, and I respectfully dissent.