Ralph BROWN, Appellant,

v.

Missouri Secretary of State, Robin CARNAHAN, Respondent,

Missouri State Auditor, Thomas Schweich, Respondent,

and

Missourians for Health and Education, Dudley McCarter, and Peggy Taylor, Respondents.

and

Victor Allred, Respondent/Cross–Appellant,

v.

Robin Carnahan, Respondent,

Thomas A. Schweich, Appellant/Cross–Respondent,

and

Missouri Jobs with Justice, Respondent/Cross–Appellant.

and

Peggy Northcott, et al., Respondents/Cross–Appellants,

v.

Robin Carnahan, et al., Appellants/Cross–Respondents.

and

Tiffany Francis, et al., Respondents/Cross–Appellants,

v.

Robin Carnahan, et al., Appellants/Cross–Respondents,

Missourians for Responsible Lending, et al., Appellants/Cross–Respondents.

and

John Prentzler, Respondent,

v.

Robin Carnahan, et al., Appellants,

Missourians for Responsible Lending,
et al., Appellants.

and

Stephen J. Reuter, Respondent,

v.

Robin Carnahan, et al., Appellants,

Missourians for Responsible Lending,
et al., Appellants.

Nos. SC 92582, SC 92564, SC 92500,
SC 92571, SC 92573, SC 92574.

Supreme Court of Missouri,
En Banc.

July 31, 2012.

Jeremiah J. Morgan, Deputy Solicitor, Patricia J. Churchill, Attorney General's Office, Jefferson City, for Carnahan.

Ronald R. Holliger, General Counsel, Attorney General's Office, Darrell L. Moore, Whitney S. Miller, Auditor's Office, Jefferson City, for Schweich.

Charles W. Hatfield, Khristine A. Heisinger, Stinson, Morrison, Hecker, LLP, Jefferson City, for Northcott, Reuter and Brown.

Marc H. Ellinger, Stephanie S. Bell, Blitz, Bardgett & Deutsch LC, Jefferson City, for Francis and Hoover.

Edward D. Greim, Todd P. Graves, Clayton J. Callen, Graves, Bartle, Marcus & Garrett LLC, Kansas City, for Allred and Prentzler.

Christopher N. Grant, Loretta K. Haggard, Schuchat Cook & Werner, St. Louis, for Missouri Jobs with Justice.

Lowell D. Pearson, R. Ryan Harding, Husch Blackwell LLP, Jefferson City, for Missourians for Health and Education, McCarter and Taylor.

PER CURIAM.

The appeals consolidated in this opinion arise from lawsuits challenging three proposed initiatives—a tobacco tax initiative, a minimum wage initiative, and a payday

loan initiative.[1] The underlying suits sought to prevent the initiatives from appearing on Missouri's ballot for the November 2012 election. Each of the cases challenges the constitutional validity of section 116.175,[2] which directs that the state auditor "shall assess the fiscal impact of" any proposed initiative petition and prepare a fiscal note and fiscal note summary.[3] Opponents of the proposed initiatives maintain that section 116.175's statutory directives conflict with Mo. CONST. art. IV, sec. 13, which provides that "[n]o duty shall be imposed on [the state auditor] by law which is not related to the supervising and auditing of the receipt and expenditure of public funds." Each appeal also challenges the fairness and sufficiency of the secretary of state's summary statements and the auditor's fiscal notes and fiscal note summaries for the proposed initiatives.

This Court finds that section 116.175 is constitutional and finds that the auditor's fiscal notes and fiscal note summaries for the proposed initiatives were fair and sufficient. This Court further finds that the secretary of state's summary statements for the initiatives were fair and sufficient. This Court finds no bar to including the secretary of state's summary statements and auditor's fiscal note summaries in the official ballot titles for the proposed initiatives. No issues presented in these appeals and cross-appeals indicate any impediment to placing the proposed initiatives on the ballot.[4]

For the reasons explained below, the trial court's judgment in the tobacco initiative case is affirmed; the judgment in the minimum wage case is affirmed in part and reversed in part; and the judgment in the payday loan initiative cases is affirmed in part and reversed in part.

## I. Background

### A. Constitutional Protections For Citizen Initiatives

Before discussing the merits of these appeals, this Court notes the protections afforded to the citizen initiative petition process provided in Missouri's constitution. This Court previously has stated:

1. The tobacco tax initiative, which is challenged in the Brown appeal, proposes additional taxes on cigarettes, roll-your-own tobacco, and other tobacco products to create proceeds for a health and education trust fund.

 The proposed minimum wage initiative, which is challenged in the Allred appeal, seeks to increase the state's minimum wage to $8.25 per hour and the minimum wage for tipped-employees to 60 percent of the minimum wage. The initiative also proposes that, if the federal minimum wage is increased above the state minimum wage, then the higher federal minimum wage rate will be in effect under the law.

 The proposed payday loan initiative seeks to limit the interest rate charged on payday, title, installment, and other high-cost consumer credit and small loans. The initiative would enact an interest rate cap of 36 percent per year for such loans. The Northcott, Fran-

 cis, Prentzler, and Reuter cases each separately challenge the proposed payday loan initiative.

2. All references to section 116.175 are to RSMo Supp.2011. All other statutory references are to RSMo 2000, unless otherwise indicated.

3. Jurisdiction over these appeals is vested in this Court pursuant to Mo. CONST. art. V, sec. 10, as this Court ordered transfer of the appeals when they were pending in the court of appeals. Further, Mo. CONST. art. V, sec. 3, provides this Court exclusive jurisdiction over the challenges presented in these appeals to the constitutional validity of section 116.175.

4. These appeals do not address whether the challenged initiatives have the requisite signatures for placement on the ballot. The secretary of state is tasked with making that determination.

Nothing in our constitution so closely models participatory democracy in its pure form. Through the initiative process, those who have no access to or influence with elected representatives may take their cause directly to the people. The people, from whom all constitutional authority is derived, have reserved the "power to propose and enact or reject laws and amendments to the Constitution." [Mo. Const., art. III, sec. 49].

*Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. banc 1990).

 To avoid encroachment on the people's constitutional authority, courts will not sit in judgment on the wisdom or folly of the initiative proposal presented, nor will this Court issue an advisory opinion as to whether a particular proposal, if adopted, would violate a superseding law of this state or the United States Constitution. *Id.* However, "[w]hen courts are called upon to intervene in the initiative process, they must act with restraint, trepidation and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course." *Id.*

 "Before the people vote on an initiative, courts may consider only those threshold issues that affect the integrity of the election itself, and that are so clear as to constitute a matter of form." *United Gamefowl Breeders Ass'n of Missouri v. Nixon*, 19 S.W.3d 137, 139 (Mo. banc 2000). As such, when initiative petitions are challenged, this Court's primary duty is to determine "whether the constitutional requirements and limits of power, as expressed in the provisions relating to the

procedure and form of initiative petitions, have been regarded." *Blunt*, 799 S.W.2d at 827.

## B. Procedures for Initiative Petitions

The constitutional requirements for an initiative petition include:

[T]he initiative petition must (1) be signed by 8% of the voters in each of two-thirds of the congressional districts in the state, (2) be filed with the Secretary of State no less than four months before an election, (3) contain a proper enacting clause, and (4) contain no more than one amended and revised constitutional article, or one new article which contains not more than one subject and matters properly connected therewith. [Mo. Const., art. III, sec. 50].

*Id.*

Before an initiative petition appears on the ballot, the requirements of chapter 116 must be met. Section 116.120.1 provides that the secretary of state shall examine any submitted petition to determine that it complies with the Missouri Constitution and chapter 116. Section 116.332.1 provides that, after receiving a proposed initiative petition, the secretary of state refers a copy of the petition to the attorney general for approval of the sufficiency of the petition as to its form. Section 116.332.1 also provides that a copy of the petition must be sent to the state auditor for "purposes of preparing a fiscal note and fiscal note summary." *See also* sec. 116.175 (instructing that the auditor "shall assess the fiscal impact of the proposed measure").[5]

The secretary of state reviews the attorney general's comments regarding the form of the petition and then makes a final

---

5. The auditor's protocol for preparing fiscal notes and fiscal note summaries is discussed in detail below. The auditor's fiscal note and fiscal note summary are reviewed by the attorney general pursuant to section 116.175.4.

decision to approve or reject the proposed petition. Sec. 116.332.3. Once a petition is approved as to its content and form, section 116.334.1 instructs that the secretary of state prepare a "concise" summary statement of the proposed measure. Section 116.334.1 provides that the summary statement cannot exceed 100 words, must be written in the form of a question, and cannot use language that is "intentionally argumentative" or that is "likely to create prejudice either for or against the proposed measure." The secretary of state's summary statement requires approval by the attorney general. Sec. 116.334.1. Pursuant to section 116.180, after the secretary of state receives the attorney general's approval for the summary and receives the approved fiscal note and fiscal note summary, the secretary of state certifies the official ballot title. The official ballot title consists of the secretary of state's summary statement and the fiscal note summary, and it is provided to the person circulating the petition for signatures and must be affixed to each page of the petition prior to its circulation for signatures. Sec. 116.180. The petitioner then begins to circulate the proposed measure to gather the signatures necessary to submit it to the secretary of state for placement on the ballot.[6]

Any citizen may challenge the official ballot title or fiscal note for a proposed initiative. Sec. 116.190.[7] The appeals at issue in this consolidated opinion reflect such challenges.

## II. Common Issues Presented

Opponents to each of the initiatives addressed in this opinion raised arguments that section 116.175 is unconstitutional under Mo. Const. art. IV, sec. 13. Each case also presented a challenge related to the fairness and sufficiency of the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary prepared for the initiatives. These common issues presented are addressed first.

### A. Standard of Review

 In a court-tried case, this Court will sustain the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *United Gamefowl Breeders,* 19 S.W.3d at 141; *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). This Court will construe liberally constitutional and statutory provisions governing the ballot initiative process to ensure the preservation of the people's power. *Blunt,* 799 S.W.2d at 827. "Statutes that place impediments on the initiative power that are inconsistent with the reservation found in the language of the constitution will be declared unconstitutional." *Id.*

### B. Auditor's Constitutional Authority to Prepare Fiscal Notes and Fiscal Note Summaries

The issue of the auditor's authority to prepare fiscal notes and fiscal note sum-

---

**6.** *Further, since 2003, section 116.025, RSMo Supp.2011, has provided that, when statewide ballot measures are submitted to the secretary of state, the secretary of state prepares and transmits to the attorney general "fair ballot language statements" for the proposed measure. The section 116.025 statement, which is posted in polling places next to the sample ballot, must "fairly and accurately explain what a vote for and what a vote against the measure represent" and must include* "whether the measure will increase, decrease, or have no impact on taxes." *The attorney general is tasked with approving the section 116.205 statement prepared by the secretary of state, and the statements can be challenged in accordance with section 116.190, RSMo Supp.2011.*

**7.** *All references to section 116.190 are to RSMo Supp.2011.*

maries was raised in all six cases before this Court.[8] Specifically, the question concerns the constitutional validity of section 116.175, wherein the legislature delegated to the auditor the duty to prepare fiscal notes and fiscal note summaries, and whether the delegation of authority in that statute violates Mo. CONST. art. IV, sec. 13.

### 1. Standard of review

▮▮▮▮ This Court reviews the constitutional validity of a statute *de novo. Gurley v. Missouri Bd. of Private Investigator Examiners,* 361 S.W.3d 406, 411 (Mo. banc 2012). "A statute is presumed valid and will not be held unconstitutional unless it clearly contravenes a constitutional provision." *In re Brasch,* 332 S.W.3d 115, 119 (Mo. banc 2011). This Court "resolve[s] all doubt in favor of the [statute's] validity" and in doing so should make every reasonable intendment to sustain its constitutionality. *Ocello v. Koster,* 354 S.W.3d 187,

197 (Mo. banc 2011) (quoting *Westin Crown Plaza Hotel Co. v. King,* 664 S.W.2d 2, 5 (Mo. banc 1984)). "The person challenging the statute's validity bears the burden of proving the act clearly and undoubtedly violates the constitution." *Kansas City Premier Apartments, Inc. v. Missouri Real Estate Comm'n,* 344 S.W.3d 160, 167 (Mo. banc 2011) (quoting *Brasch,* 332 S.W.3d at 119).

▮▮▮▮ Generally, "constitutional provisions are subject to the same rules of construction as other laws, except that constitutional provisions are given a broader construction due to their more permanent character." *StopAquila.org v. City of Peculiar,* 208 S.W.3d 895, 899 (Mo. banc 2006). This broad reading does not permit this Court to ascribe to the provision "a meaning that is contrary to that clearly intended by the drafters." *Farmer v. Kinder,* 89 S.W.3d 447, 452 (Mo. banc 2002). "Of particular importance is the

**8.** The Brown suit sought a declaratory judgment that section 116.175 is unconstitutional because it provides the auditor greater authority than is authorized by Mo. CONST. art. IV, sec. 13. The trial court found in *Brown* that the auditor's duty to prepare fiscal notes under section 116.175 is consistent with the auditor's authority provided by Mo. CONST. art. IV, sec. 13. It opined that the auditor is the "proper elected official to perform the responsibility of advising the people of Missouri on the expected fiscal impact" of the proposed tobacco tax initiative. It noted that the proposed tobacco tax initiative directly would impact state revenues. It also determined that the proposed initiative's fund disbursement directives are related to the auditor's task of "supervising the receipt and expenditure of public funds."

The Allred case also alleged that section 116.175 was unconstitutional because it granted the state auditor authority beyond that provided by Mo. CONST. art. IV, sec. 13. The trial court's judgment in Allred declared that section 116.175 violates Mo. CONST. art. IV, sec. 13 because the statute expands the auditor's tasks beyond the constitutional limi-

tations established for the auditor's duties. The trial court held that estimating the fiscal impact of a proposed initiative was "forecasting what might happen" and did not "relate to" Mo. CONST. art. IV, sec. 13's limitation that the auditor's duties pertain to the "supervising and auditing of the receipt and expenditure of public funds." The trial court also found that the auditor's fiscal note and fiscal note summary preparations were not a "true 'investigation'" because the auditor pasted voluntary responses without making follow-up inquiries regarding the submissions used in the fiscal note. The trial court vacated the fiscal note and fiscal note summary for the minimum wage initiative. The judgment indicated that the fiscal note summary should be removed from the official ballot title for the minimum wage initiative.

The Northcott and Francis suits challenging the proposed payday loan initiative also raised claims challenging the constitutional validity of section 116.175, arguing that the auditor has no constitutional authority to engage in the fiscal note duties directed by the statute. The trial court declined to declare section 116.175 unconstitutional as was urged by the opponents to the proposed initiative.

principle that in determining meaning of a constitutional provision due regard will be given to [its] primary objects and all related provisions should be construed as a whole and where necessary to bring conflicts, if any, into harmony." *State, at Information of Martin v. City of Independence*, 518 S.W.2d 63, 66 (Mo.1974).

## 2. The auditor's authority

Mo. CONST. art. IV, sec. 13 provides:

The state auditor shall have the same qualifications as the governor. He [or she] shall establish appropriate systems of accounting for all public officials of the state, post-audit the accounts of all state agencies and audit the treasury at least once annually. He [or she] shall make all other audits and investigations required by law, and shall make an annual report to the governor and general assembly. He [or she] shall establish appropriate systems of accounting for the political subdivisions of the state, supervise their budgeting systems, and audit their accounts as provided by law. No duty shall be imposed on him [or her] by law which is not related to the supervising and auditing of the receipt and expenditure of public funds.

The auditor's authority to prepare fiscal notes and fiscal note summaries was delegated by the legislature after this Court's decision in *Thompson v. Committee on Legislative Research*, 932 S.W.2d 392 (Mo. banc 1996). In *Thompson*, this Court held section 116.170.2, RSMo 1994, violated the constitution when the legislature delegated the authority to prepare fiscal notes and fiscal note summaries to the joint committee on legislative research because the legislature had no power to adopt a statute that increased the duties of the committee beyond those expressly authorized by Mo. CONST. art. III, sec. 35. *Id.* at 395.

After *Thompson*, the legislature promulgated section 116.175, which sets forth the procedure for the auditor's preparation of the fiscal note and fiscal note summary for any petition sample sheet, joint resolution, or bill. Section 116.175.1 states the auditor "shall assess the fiscal impact of the proposed measure" and "may consult with the state departments, local government entities, the general assembly and others with knowledge pertinent to the cost of the proposal." Proponents and opponents of any proposed measure are permitted to submit their own fiscal impact statement to the auditor. *Id.* Section 116.175.2 directs the auditor to prepare the fiscal note and fiscal note summary within 20 days of receipt of the petition sample sheet. The auditor's fiscal note and fiscal note summary "shall state the measure's estimated cost or savings, if any, to state or local governmental entities." Sec. 116.175.3. Further, "[t]he fiscal note summary shall contain no more than fifty words, excluding articles, which shall summarize the fiscal note in language neither argumentative nor likely to create prejudice either for or against the proposed measure." *Id.*

## 3. The auditor's preparation of fiscal notes and fiscal note summaries is an "investigation"

A general discussion of the auditor's protocol for preparing fiscal notes and fiscal note summaries will suffice to resolve the constitutional issue presented. First, the parties dispute the definition of "investigation" contained in Mo. Const. art. IV, sec. 13 and whether the auditor's preparation of the fiscal notes and fiscal note summaries is an "investigation." The constitutional provision does not define "investigation."

"[W]hen words are not used in a technical sense, they 'must be given their plain or ordinary meaning unless such con-

struction will defeat the manifest intent of the constitutional provision.' " *Mo. Prosecuting Attorneys v. Barton County,* 311 S.W.3d 737, 742 (Mo. banc 2010) (quoting *Rathjen v. Reorganized Sch. Dist. R–II of Shelby County,* 365 Mo. 518, 284 S.W.2d 516, 523 (Mo. banc 1955)). If a word used is not defined, the Court determines the plain and ordinary meaning of the word as found in the dictionary. *In re Finnegan,* 327 S.W.3d 524, 526 (Mo. banc 2010).

"Investigation" is defined as "detailed examination ... study ... research ... official probe." WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 1189 (2002). Similarly, "investigate" is defined as "to observe or study closely ... to conduct an official inquiry." *Id.*

■ What the auditor does in preparing a fiscal note and fiscal note summary is certainly an official inquiry performed pursuant to statutory directive. In preparing the fiscal note, the auditor sends copies of the proposed ballot initiative to various state and local governmental entities requesting the entities review the same and provide information regarding the estimated costs or savings, if any, for the proposed ballot initiative. *See* sec. 116.175.1 (stating that the auditor "may consult with the state departments, local government entities, the general assembly and others with knowledge pertinent to the cost of the proposal"). The auditor chooses local governmental entities based on geography, population, and form of government to ensure a good cross-section of local governments that might be affected by the proposal are represented. Proponents, opponents, and members of the public may submit fiscal impact submissions also; however, the auditor has no

duty to notify members of the public when he receives an initiative petition from the secretary of state.

The auditor does not analyze or evaluate the correctness of the returned fiscal impact submissions. Rather, he or she examines the submissions to determine whether they appear complete, are relevant, have an identifiable source, and are reasonable. The auditor studies each submission regarding completeness, determining whether the entity's response conveys a complete representation of what the entity intended to send and if it reasonably is related to the proposal. He also reviews the submission to ensure there are no missing pages or breaks in the continuity of information. With respect to reasonableness, the auditor examines the submission to establish whether it addresses or diverges from the particular issue. The auditor's determination of reasonableness is based on the auditor's experience in state government and overall knowledge and understanding of business and economic issues. If the auditor concludes a submission is unreasonable, he or she determines what weight the submission will be given when preparing the fiscal note summary. If the auditor has any questions regarding the submission of an entity or needs to clarify an incomplete submission, he or she may conduct a follow-up inquiry.[9]

The auditor then drafts the fiscal note and fiscal note summary based solely on the responses he or she receives. The responses submitted are listed verbatim in the fiscal note with only minor editing. The fiscal note summary is a compilation of the various proposals and is intended to advise the voters about the potential cost

9. Although section 116.175 imposes a 10–day deadline for submissions, the current auditor's practice is to consider information received beyond the deadline if there is time available to analyze the submission, as he believes that more information yields a better fiscal note and fiscal note summary.

or savings, if any, from the adoption of the initiative.[10] Hence, the auditor's actions throughout the process of preparing the fiscal notes and fiscal note summaries fall under the plain meaning of "investigate" and "investigation."

In *Allred*, the opponents to the proposed minimum wage initiative assert that section 116.175 does not require the auditor to "investigate" the fiscal impact of a proposed initiative but rather to "assess" it. They contend that, because section 116.175 does not direct the auditor to "investigate" the fiscal impact, the act of "assessing" the impact is an impermissible delegation of the auditor's duty by the legislature.

"Assess" is defined as "to make an official valuation or estimate of" some item. WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 131 (2002). Undoubtedly, to assess the fiscal impact of a proposed initiative, the auditor must inquire about it, solicit comments, and then review and examine those comments. A systemic, official inquiry such as the auditor undertakes that results in an estimate of the potential fiscal impact of a proposed initiative is an assessment, which is the dictionary definition of "investigation." As such, there is no qualitative difference between "investigating" and "assessing" the fiscal impact of a proposed measure.

The parties in these cases also diverge with respect to the extent and intensity of the investigation the auditor must conduct in order to meet his or her constitutional duty under Mo. CONST. art. IV, sec. 13. Specifically, Allred argues section 116.175 does not direct the auditor to perform what the Missouri Constitution requires, which is a "true" investigation regarding the fiscal impact of an initiative petition. Instead, Allred believes the statute asks the auditor to oversee a less rigorous, al-

most clerical compilation or assembly of predictions by various third parties about what might happen to future costs and revenues. The auditor concedes he conducts no independent research or analysis regarding the fiscal impact of a proposed initiative.

■■■■■ The extent and intensity of an investigation and resulting fiscal note in a particular case presents a question of statutory compliance under section 116.175 but is irrelevant to whether the statute unconstitutionally delegated authority to the auditor. The auditor is not required to compel and second-guess reasonable submissions from entities but is able to rely on the responses submitted. Nor should the auditor wade into the policy debates surrounding initiative petitions, which an independent investigation would entail. In each of these cases, proponents and opponents argued zealously for their position with respect to the initiative at issue. It is not the auditor's role to choose a winner among these opposing viewpoints by independently researching the issue himself, double-checking economic theories and assumptions, and adopting one side's view over another's in the resulting fiscal note.

### 4. Investigation is "related to" the "supervising" of the "receipt and expenditure of public funds"

Finding that the auditor's procedure for the preparation of fiscal notes and fiscal note summaries is an "investigation" under Mo. CONST. art. IV, sec. 13 does not end this Court's inquiry. The parties also disagree as to whether the auditor's investigation is "related to the supervising ... of the receipt and expenditure of public funds." The auditor believes his duty to prepare the fiscal notes and fiscal note

---

10. The current auditor's practice is to draft the fiscal note summary to "summarize" points he thinks "are important for the public."

summaries falls within this language because investigations related to the receipt and expenditure of public funds naturally are related to and associated with determining the fiscal impact of a proposed initiative. The initiative opponents disagree with the auditor's position. They argue the inclusion of the phrase "related to" serves to restrict the auditor's authority and cite this Court's holding in *Farmer*, 89 S.W.3d 447, for support.

In *Farmer*, this Court resolved the constitutional validity of section 447.575, RSMo 2000, which delegated a duty to the state treasurer to collect unclaimed property under the Uniform Disposition of Unclaimed Property Act (UDUPA). *Farmer*, 89 S.W.3d at 449. Section 447.575 authorized the treasurer to bring suit against persons who refused to deliver unclaimed property to the State as required under UDUPA. *Farmer*, 89 S.W.3d at 452. The respondents argued Mo. CONST. art. IV, sec. 15 prohibited the treasurer from exercising the collection power in section 447.575. *Farmer*, 89 S.W.3d at 452.

In finding section 447.575 unconstitutional, this Court construed the language, "No duty shall be imposed on the state treasurer by law which is not related to the receipt, investment, custody and disbursement of state funds and funds received from the United States government" contained in Mo. CONST. art. IV, sec. 15. *Farmer*, 89 S.W.3d at 452. The treasurer argued this provision should be construed broadly to find the act of receiving or collecting abandoned property was related to the receipt, investment, custody, and disbursement of state funds. *Id.* This Court disagreed, stating:

> [T]his Court finds that [Mo. CONST. art. IV, sec. 15] does not expressly or implicitly grant the treasurer authority to enforce delivery of property but, to the contrary, specifically denies [the trea-

surer] that power. The treasurer would have us construe section 15 as if it were a broad grant of power to undertake actions not limited to those related to receipt, investment, custody and disbursement of state funds and funds received from the United States government. But, the words used to describe the treasurer's powers do not broaden or expand the treasurer's authority, but rather are words of restriction. The constitution enumerates very specific powers that the treasurer may exercise and, then, specifically provides that no duty not related to those specifically enumerated powers may be exercised by her.

*Id.* at 453.

Further, this Court relied upon other limiting provisions in the constitution, including Mo. CONST. art. IV, sec. 13, applicable to the auditor, and Mo. CONST. art. IV, sec. 14, which applies to the secretary of state. *Farmer*, 89 S.W.3d at 453. This Court explained:

> There were no similar limitations in the 1875 Constitution, and this Court has previously recognized that it was to correct this situation that these limiting provisions were added to the 1945 constitution, for:
>
>> the background of the 1945 provision lies in the prior history of a building up of the power and patronage of elected officials by giving to them new functions and duties. One purpose of the new constitution was to limit and define the scope and duties of all executive officials, agencies, and departments, including elected officials.
>
> Indeed, the 1944 debates over the 1945 constitution themselves show that the delegates to the constitutional convention drafted it with an eye towards their concern that power had been too widely distributed among a variety of elected

officials under the 1875 constitution and that a focusing of more executive power in the office of the governor and his or her appointees might lead to more effective government. One way the 1945 constitution sought to accomplish this goal was by precluding the expansion of the state treasurer's role beyond that of custodian of state funds and by similarly limiting the power of the state auditor and secretary of state.

*Id.* at 453–454 (internal citations omitted).

The initiative opponents argue this Court's analysis in *Farmer* is controlling and resolves the issue of the auditor's authority, especially when construing the phrase "related to" in a narrow fashion. The auditor avers *Farmer* is distinguishable; however, the auditor concedes the last sentence of Mo. CONST. art. IV, sec. 13 should not be construed as anything other than a limitation on the legislature's authority to impose duties upon him.

While *Farmer* found the treasurer was seeking to expand her powers beyond those enumerated in Mo. CONST. art. IV, sec. 14, the provision at issue here is distinguishable because it explicitly grants the auditor authority to conduct "investigations as required by law." As such, the auditor is not seeking to expand his power but rather is exercising a power he expressly possesses. Moreover, in *Farmer,* other state officials had the power to collect funds. Here, no other official has the express power to draft a fiscal note or fiscal note summary.

■ Although *Farmer* is distinguishable, this Court is mindful that the language "related to" was construed narrowly to avoid expanding the powers of executive officials. Like "investigation," "related to" has not been defined in this provision. "Related" is defined as "having a relationship; connected by reason of an established or discoverable relation...."

WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 1916 (2002). By including the phrase "related to," the drafters of the constitution imposed a limitation on the scope of "investigation" by the auditor and any other duties to *only* those "related to" "the supervising ... the receipt and expenditure of public funds." There is a relationship between the auditor's preparation of the fiscal notes and fiscal note summaries and the "supervising ... of the receipt and expenditure of public funds." Initiative proposals may have a clear impact on the expenditure and receipt of public funds, especially when they seek tax increases resulting in a direct impact on state revenues. As such, it is appropriate for the auditor to advise Missouri citizens about the expected fiscal impact of a proposed initiative measure as part of his power "related to ... supervising the receipt and expenditure of public funds."

The initiative opponents also draw a sharp distinction between acts by the auditor that look forward instead of backward as set forth in Mo. CONST. art. IV, sec. 13. They argue the auditor's preparation of the fiscal notes and fiscal note summaries is nothing more than an exercise in predicting future, hypothetical budget impacts because there are no state funds yet at issue with an initiative petition so there can be no receipt or expenditure of funds to be supervised or audited. This is in contrast to the auditor's power to conduct audits, which by their nature are a retrospective review of the expenditure of public funds.

■ No language in Mo. CONST. art. IV, sec. 13 creates this distinction. A plain reading of the powers enumerated in this provision permits the auditor to engage in a review of past, present, and future receipts and expenditures of public funds. For example, the auditor's power to con-

duct post-audits of state agencies necessarily requires the examination of the past receipt and expenditure of public funds. Further, the auditor's power to conduct investigations as required by law is silent with respect to time restrictions. Finally, supervising the budgeting systems of political subdivisions of the state contemplate contemporaneous action related to the supervising of the receipt and expenditure of public funds.

For these reasons, this Court concludes that Mo. CONST. art. IV, sec. 13 permits the auditor to prepare the fiscal note and fiscal note summary as part of an investigation that is related to the supervision of the receipt and expenditure of public funds. Therefore, section 116.175 is constitutional and does not impermissibly delegate duties to the auditor beyond those prescribed in Mo. CONST. art. IV, sec. 13.

In *Brown,* the trial court's judgment is affirmed on this issue, as it rightly determined that section 116.175 is constitutional. In *Allred,* the trial court's judgment is reversed on this issue, as it erred in finding that section 116.175 violated Mo. CONST. art. IV, sec. 13. In the payday loan initiative cases, the trial court did not err in determining this issue, as it rejected the initiative opponents' claims that section 116.175 is unconstitutional. The judgment entered for the payday loan cases is affirmed insofar as it correctly determined this constitutional issue.

## C. Sufficiency and Fairness

Each appeal consolidated in this opinion also presents a challenge regarding the fairness and sufficiency of the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary for the proposed initiative. Before detailing the claims related to each proposed initiative, it is helpful to understand the standards applicable for assessing the fairness and sufficiency of initiative summary statements and fiscal notes and fiscal note summaries.

■ *De novo* review of the trial court's legal conclusions about the propriety of the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary is the appropriate standard of review when there is no underlying factual dispute that would require deference to the trial court's factual findings. *See Missouri Mun. League v. Carnahan,* 303 S.W.3d 573, 579–80 (Mo.App.2010).

■ Secretary of state summary statements and auditor fiscal notes and fiscal note summaries are required by section 116.190.3 to be sufficient and fair, as that statute requires:

The petition [challenging a proposed initiative's official ballot title] shall state the reason or reasons why the summary statement portion of the official ballot title is insufficient or unfair and shall request a different summary statement portion of the official ballot title. Alternatively, the petition shall state the reasons why the fiscal note or the fiscal note summary portion of the official ballot title is insufficient or unfair and shall request a different fiscal note or fiscal note summary portion of the official ballot title.

In this context, "insufficient" and "unfair" require definition and are given a statutory interpretation that applies their common meaning. *See Buechner v. Bond,* 650 S.W.2d 611, 613 (Mo. banc 1983). When reviewing whether the secretary of state and the auditor have complied with the fairness and sufficiency requirements under section 116.190, this Court considers that "insufficient means inadequate; especially lacking adequate power, capacity, or competence" and "unfair means to be marked by injustice, partiality, or decep-

tion." *See State ex rel. Humane Soc'y of Missouri v. Beetem,* 317 S.W.3d 669, 673 (Mo.App.2010) (internal quotations omitted).

■■■ The secretary of state's summary statement must be "concise" and cannot be "intentionally argumentative" or "likely to create prejudice." Sec. 116.334.1. To create such a summary statement that is not insufficient or unfair, the summary statement must be adequate and state the consequences of the initiative without bias, prejudice, deception, or favoritism. *See State ex rel. Humane Soc'y of Missouri,* 317 S.W.3d at 673 (internal quotations omitted). The language used should "fairly and impartially summariz[e] the purposes of the measure so that voters will not be deceived or misled." *Missouri Mun. League v. Carnahan,* 364 S.W.3d 548, 552 (Mo.App.2011) (internal quotations omitted). It should accurately reflect the legal and probable effects of the proposed initiative. *Missouri Mun. League,* 303 S.W.3d at 584. Sometimes it is necessary for the secretary of state's summary statement to provide a context reference that will enable voters to understand the effect of the proposed change. *See Missouri Mun. League,* 364 S.W.3d at 553.

■■■ Section 116.175.3 instructs the auditor to prepare a fiscal note and fiscal note summary for a proposed initiative that "state[s] the measure's estimated cost or savings, if any, to state or local governmental entities." In the context of requiring a fair and sufficient fiscal note by the state auditor, "the words insufficient and unfair . . . mean to inadequately and with bias, prejudice, deception and/or favoritism state the fiscal consequences of the proposed proposition." *Hancock v. Secretary*

of State, 885 S.W.2d 42, 49 (Mo.App.1994). Similarly, in examining the fairness and sufficiency of the fiscal note summary, the summary's words are considered sufficient and fair where they adequately and without bias, prejudice, or favoritism synopsize the fiscal note. *See id.* "[A] fiscal note summary is not judged on whether it is the 'best' language, only [on] whether it is fair." *Missouri Mun. League,* 303 S.W.3d at 583.

Requiring fairness and sufficiency of an initiative's summary statement, fiscal note, and fiscal note summary reflects that there are "procedural safeguards [in the initiative process that] are designed either, (1) to promote an informed understanding by the people of the probable effects of the proposed amendment, or (2) to prevent a self-serving faction from imposing its will upon the people without their full realization of the effects of the amendment." *Buchanan v. Kirkpatrick,* 615 S.W.2d 6, 11–12 (Mo. banc 1981). Initiative process "safeguards . . . assure that the desirability of the proposed amendment may be best judged by the people in the voting booth." *Id.* at 12.

### III. Assessing the Challenged Initiatives

#### A. The Tobacco Tax Initiative

After the official ballot title for the tobacco tax initiative was certified, tobacco tax initiative opponent Ralph Brown brought a lawsuit challenging the fairness and sufficiency of the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary that were prepared for the proposed initiative.[11]

---

11. Although the underlying judgment in this case applies collectively to six nearly identical tobacco tax initiatives, this Court has been informed that only one of the versions of the proposed initiatives actually was returned to the secretary of state with signatures. Accordingly, the six petitions are referenced collectively as a singular initiative.

The trial court entered a judgment denying Brown's claims contesting the fairness and sufficiency of the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary.

## 1. The tobacco tax initiative summary statement was fair and sufficient

The tobacco tax initiative proposes additional taxes on certain tobacco products in an effort to fund a health and education trust fund to educate about tobacco use prevention and quitting tobacco use. Fund proceeds also are proposed to be available for elementary, secondary, and higher education funding. The proposed initiative additionally seeks to amend chapter 196 as it relates to the administration of the tobacco manufacturer escrow fund, as the tobacco tax initiative proponents believe that the current escrow scheme provides a refund "loophole" to nonparticipating tobacco manufacturers. The secretary of state prepared this summary statement for the proposed tobacco tax initiative:

Shall Missouri law be amended to:

- create the Health and Education Trust Fund with proceeds of a tax of $0.0365 per cigarette and 25 [percent] of the manufacturer's invoice price for roll-your-own tobacco and 15 [percent] for other tobacco products;

- use Fund proceeds to reduce and prevent tobacco use and for elementary, secondary, college, and university public school funding; and

- increase the amount that certain tobacco product manufacturers must maintain in their escrow accounts, to pay judgments or settlements, before any funds in escrow can be refunded to the tobacco product manufacturer

and create bonding requirements for these manufacturers.

Brown argues that this summary statement is unfair and insufficient because its second paragraph language is overly limiting in stating that the initiative would amend the law to "use [the trust fund] proceeds to reduce and prevent tobacco use and for elementary, secondary, college, and university public school funding." Brown contends that this language provides voters incorrect advice because it identifies only two uses for the trust fund—(1) reducing and preventing tobacco use and (2) for education—whereas the fund may be used for many more purposes. He asserts that the summary statement should have reflected the proposed initiative's other possible funding, including payment of administrative costs, replacement revenues for lost tobacco tax revenues that would result from decreased tobacco purchases, tobacco settlement agreement funding, and loan forgiveness for rural medical professionals. Brown maintains that the summary statement would have been more accurate had it used broader language as to the possible trust fund uses. He suggests the summary should have used a phrase like "including" or "among others." He further contends that the summary statement's language suggesting use limitations for the trust fund were exacerbated by the auditor's fiscal note summary, which included a statement that the fund's "revenue will fund only programs and services allowed by the proposal." Brown urges this Court to find that the summary statement's failure to incorporate broader fund-use categories indicates that it did not advise po-

Missourians for Health and Education, the group that filed the proposed initiative, and two of its directors, moved to intervene in the litigation. Intervention was granted over Brown's objections.

656

tential initiative signers or voters of the initiative's probable effects.

Brown also argues that the third paragraph of the summary statement is unfair because it mischaracterizes the initiative and is inaccurate. He asserts that the summary language stating that the proposed initiative will "increase the amount that certain tobacco product manufacturers must maintain in their escrow accounts" is "absolutely wrong." The required escrow amount is specified in section 196.1003(b)(1), RSMo Supp.2011, and Brown argues that the statutory requirement is not altered by the proposed tobacco tax initiative. Instead, he argues that the proposal would alter how much can be refunded to certain manufacturers from escrow pursuant to section 196.1003(b)(2)(B). He notes that the summary statement references escrow refunds, but he contends that the language incorrectly suggests a change to section 196.1003(b)(1).

Brown further contends that the third paragraph of the summary is incorrect because it is unclear by its use of the phrase "these manufacturers." He argues that the summary language suggests that a bonding requirement is created for only manufacturers who are entitled to an escrow refund, whereas the requirement also is created for manufacturers who will not be entitled to a refund. He also argues that the summary's use of "these manufacturers" wrongly suggests that a bonding requirement is imposed on all manufacturers who are entitled to a refund.

This Court finds that the trial court rightly rejected Brown's arguments challenging the insufficiency and unfairness of the secretary of state's summary statement. As was the trial court, this Court is mindful of the 100–word limit imposed on the summary statement by section 116.334. Especially considering

that limitation, the degree of specificity that Brown contends was necessary to create a fair and sufficient summary statement is not required. The summary statement "need not set out the details of the proposal" to be fair and sufficient. *Cf. United Gamefowl Breeders*, 19 S.W.3d at 141. The test is not whether increased specificity and accuracy would be preferable or provide the best summary. *Missourians Against Human Cloning v. Carnahan*, 190 S.W.3d 451, 457 (Mo.App.2006). Rather, "[t]he important test is whether the language fairly and impartially summarizes the purposes of the initiative." *Id.* (internal quotations omitted). The secretary of state's summary statement for the tobacco tax initiative complied with this requirement.

Importantly, the secretary of state's summary statement provided sufficient information to make clear the purpose of the proposed tobacco tax initiative and give notice to those interested in or affected by the proposal. *Cf. United Gamefowl Breeders*, 19 S.W.3d at 140 (stating in a clear title challenge case that "[t]he test is whether the ballot title makes the subject evident with sufficient clearness to give notice of the purpose to those interested or affected by the proposal."). The summary statement complied with the requirement that it "accurately [reflect] the legal and probable effects of the [proposed] initiative." *See Missouri Mun. League*, 303 S.W.3d at 584.

This Court accepts the secretary of state's assertions that her summary statement was an accurate explanation of the proposed initiative's modifications to the escrow and bonding requirements for tobacco product manufacturers. Further clarifying the bonding requirement language might make the summary more accurate, but it was not legally necessary to make the summary fair and sufficient.

This Court agrees with the trial court that the language utilized in the third bullet point of the summary statement did not render the summary statement unfair or insufficient.

For these reasons, the trial court did not err in upholding the secretary of state's summary statement for the tobacco tax initiative, and its judgment on this issue is affirmed.

## 2. The tobacco tax initiative fiscal note summary was fair and sufficient

Brown also argues that the fiscal note summary the auditor prepared for the tobacco tax initiative was unfair and insufficient. The fiscal note summary for the proposed measure states: [12]

> Estimated additional revenue to state government is $283 million to $423 million annually with limited estimated implementation costs or savings. The revenue will fund only programs and services allowed by the proposal. The fiscal impact to local governmental entities is unknown. Escrow fund changes may result in an unknown increase in future state revenue.

Brown's appeal asserts that this fiscal note summary is unfair and insufficient because it wrongly reiterates the secretary of state's summary statement's suggestions about the reach of the initiative. He contends that the fiscal note summary should not have included a suggestion that the tobacco tax initiative will create "revenue [that] will fund only programs and services allowed by the proposal." He argues that this language provides improper commentary about the proposed initiative, and he asserts that the auditor's fiscal note summary is limited by section 116.175 to using language that only relates to the proposed measure's "estimated cost of savings." Brown maintains that the language at issue demonstrates that the auditor overlapped the secretary of state's summary statement duties by making an improper "comment" about the proposed initiative.

In rejecting this language argument, the trial court found that the challenged fiscal note summary language was not inaccurate or unfairly prejudicial. Its judgment highlighted the auditor's duty to assess the proposed initiative's fiscal impact and suggested that the challenged language reflected the auditor's fiscal impact assessment of the proposal.

■ Brown fails to persuade that the trial court erred in reaching these conclusions. This Court agrees with the auditor's arguments that the fiscal note summary language at issue reflected a fiscal impact assessment of the proposed measure and was in line with the auditor's duties to inform the public of the fiscal

12. The auditor's staff member who prepared the fiscal notes and fiscal note summaries for the proposed tobacco tax initiatives testified at trial about the protocols applied in preparing the fiscal note and fiscal note summary for the proposed tobacco tax initiative. He explained that fiscal impact inquiries were made with 24 state agencies and 17 local government and public agencies, and 26 fiscal impact submissions were returned. The submissions were reviewed for reasonableness and completeness, and none was found to be unreasonable. The fiscal note for the proposed tobacco tax initiative was prepared by largely using the fiscal impact submissions "verbatim."

Testimony at trial explained that the auditor's position is that there is no need for the auditor's office to perform an independent analysis or "second guess" agency fiscal impact submissions when preparing fiscal notes and fiscal note summaries. In the tobacco initiative case, however, the auditor's staffer admitted that he had consulted a Wikipedia page about the tobacco settlement when he was preparing the fiscal note for the proposed tobacco tax initiative.

consequences of a proposed initiative. *See Missouri Mun. League*, 303 S.W.3d at 582 (stating the purpose of the auditor's duty to prepare fiscal notes is to "inform the public of the fiscal consequences of the proposed measure").

The trial court did not err in upholding the auditor's fiscal note summary statement for the tobacco tax initiative, and its judgment is affirmed on this issue.

### 3. The trial court did not err in rejecting Brown's res judicata claims

Also at issue in the Brown appeal is whether the trial court erred in refusing to accept Brown's *res judicata* arguments asserting that the issue of the constitutional validity of section 116.175 previously was decided against the auditor's position and not appealed by the auditor.

Brown's assertions of *res judicata* stemmed from his having brought four prior cases that alleged that section 116.175 is unconstitutional. These cases were assigned to the same trial judge, who entered four separate final judgments finding that section 116.175 violated Mo. Const. art. IV, sec. 13. The auditor appealed one of the four judgments to this Court. *Brown v. Carnahan and Schweich*, No. SC92492. The other three trial court judgments are final and have not been appealed.

In the interim, Brown filed another declaratory judgment and petition for injunctive relief attacking the auditor's constitutional authority before a different trial court judge, which is the subject of this appeal. After a hearing on a motion for judgment on the pleadings, Brown filed "Supplemental Suggestions Concerning Res Judicata and Count IV—the Unconstitutionality of Section 116.175," in which he injected this issue of *res judicata* for the first time, claiming the trial court's judgments in the three unappealed cases were binding and conclusive as to the issue of the auditor's constitutional authority to prepare the fiscal notes and fiscal note summaries.[13]

The trial court rejected Brown's constitutional challenge to the validity of section 116.175 and found Brown waived his *res judicata* argument because the claim was untimely. The trial court went on to find that even had Brown raised the issue timely, it would not apply because the initiative petitions involved were different and the parties to the lawsuits were different.

On appeal, Brown argues the trial court erred as a matter of law by denying his request for a declaratory judgment that section 116.175 violates the Missouri Constitution because claim preclusion required entry of judgment in his favor. Brown asserts the same issue was litigated previously between the same parties, a final judgment was entered by another court, and that judgment was not appealed. Moreover, Brown argues he did not waive his right to raise claim preclusion because he could not have included it in his pleadings because of the timing of the judgments. Accordingly, Brown believes this Court is foreclosed from adjudicating the auditor's appeal in this case.

While Brown characterizes his argument in terms of *res judicata*, what he ultimately raised below was an offensive collateral estoppel claim. Collateral estoppel, or issue preclusion, is used to preclude the relitigation of an issue that already has been decided in a different cause of action. *Sexton v. Jenkins & Associates, Inc.*, 152 S.W.3d 270, 273 (Mo. banc 2004). "The doctrine requires that the issue was fully

---

**13.** This motion and the auditor's responsive motion alleging Brown's supplemental suggestions were untimely were not included in the legal file filed with this Court.

and fairly litigated, that the issue was essential to the earlier judgment, and that the earlier judgment be final and binding on the party against whom it is asserted." *Id.* This doctrine may be employed offensively or defensively. *James v. Paul,* 49 S.W.3d 678, 685 (Mo. banc 2001) "[O]ffensive collateral estoppel normally involves the attempt by a plaintiff to rely on a prior adjudication of an issue to prevent the defendant from challenging a fact necessary to the plaintiff's case and on which the plaintiff carries the burden of proof." *Id.* Generally, an offensive use of collateral estoppel is less favored than a defensive use. *Id.*

Facts that give rise to an issue preclusion claim, by their very nature, are known to the party from the inception of the lawsuit. Accordingly, a party "should not be able to hold preclusion in reserve as a 'stealth defense' long after the time for raising substantive defenses has passed." *Heins Implement Co. v. Missouri Highway & Transp. Comm'n,* 859 S.W.2d 681, 685 (Mo. banc 1993) (discussing untimely assertion of *res judicata* defense). Hence, to invoke offensive collateral estoppel, it must be pleaded timely in the plaintiffs petition. *Consumer Fin. Corp. v. Reams,* 158 S.W.3d 792, 797 (Mo.App.2005).

Brown concedes he did not raise *res judicata,* issue preclusion, or offensive collateral estoppel in any of his pleadings, in his motion for judgment on the pleadings, or at the hearing prior to the matter being submitted for a ruling. However, Brown argues he has not waived his right to raise preclusion because he could not have included it in his pleadings because of the timing. None of the previous judgments was final before the auditor indicated he wished to appeal, and as such, Brown believes he would have compromised his legal position had he raised preclusion earlier in the instant appeal. This argument is unavailing given this Court's disfavor of allowing a party to employ offensive collateral estoppel and the facts that the auditor's appeal was filed and the unappealed judgments were final before briefing and the hearing by the trial court in this case.

Brown's *res judicata* argument fails, and the trial court's judgment in *Brown* is affirmed.

## B. The Minimum Wage Initiative

Victor Allred brought the suit that challenges the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary for the proposed minimum wage initiative. He alleges that the summary statement, fiscal note, and fiscal note summary are insufficient, misleading, biased, and unfair.[14] The trial court found that the secretary of state's summary statement was fair and sufficient, and it upheld the fairness and sufficiency of the auditor's fiscal note and fiscal note summary.[15] Allred cross-appeals to challenge the trial court's fairness and sufficiency findings.[16]

14. Missouri Jobs with Justice, a group seeking changes in Missouri's required minimum wage rate, filed two proposed minimum wage initiatives with the secretary of state, though it later withdrew its second proposed minimum wage initiative. Because only one version of the initiative is on file, this opinion references a singular minimum wage initiative. Missouri Jobs with Justice was granted intervention in *Allred* following an interlocutory appeal.

15. The trial court vacated the fiscal note summaries prepared for the minimum wage initiatives and indicated they should be removed from the official ballot title.

16. The appeal in *Allred was* filed by the auditor to challenge the judgment finding section 116.175 unconstitutional.

### 1. The minimum wage initiative summary statement was fair and sufficient

Under the proposed minimum wage initiative, the state's minimum wage would be increased to $8.25 per hour and the minimum wage for tipped-employees would be 60 percent of the minimum wage. The proposed initiative also includes that, if the federal minimum wage is increased above the state minimum wage, the higher federal minimum wage rate would be in effect under the law. The secretary of state's summary statement for the proposed minimum wage initiative states:

Shall Missouri law be amended to:

● increase the state minimum wage to $8.25 per hour, or to the federal minimum wage if that is higher, and adjust the state wage annually based upon changes in the Consumer Price Index;

● increase the minimum wage for employees who receive tips to 60 [percent] of the state minimum wage; and

● modify certain other provisions of the minimum wage law including the retail or service business exemption and penalties for paying employees less than the minimum wage?

Allred first argues that this summary statement must be revised because it wrongly suggests that Missouri law will be "amended" by the proposed minimum wage initiative to adjust the state minimum wage based on changes to the consumer price index (CPI). He argues that this is inaccurate because the CPI can be applied under existing law to adjust the minimum wage. The secretary of state, however, asserts that the reference to the CPI adjustment in the summary statement is necessary context to understand the proposed initiative's potential effects, as the CPI is not actually applied under Missouri's current minimum wage scheme. The trial court agreed with the secretary

of state, finding that the reference to the CPI was not used to repeat the existing law "but to show that the state minimum wage, regardless of its source, [now would be] subject to the [CPI]."

 References to current law to provide context to a summary statement do not render the summary statement unfair or prejudicial. *Missouri Mun. League*, 364 S.W.3d at 553 ("The mere fact that a proposal references something currently in the Constitution does not make it automatically unfair or prejudicial; indeed, such a rule would be absurd in that at least in some instances context demands a reference to what is currently present to understand the effect of the proposed change."). As such, Allred fails to persuade that the trial court erred in finding that the CPI reference was fair and sufficient in the summary statement for the minimum wage initiative.

Allred further argues that the secretary of state's summary statement cannot be upheld because it is not accurate in suggesting that the minimum wage is less for tipped-workers than for non-tipped workers. He argues that both types of workers currently are entitled to the same minimum wage when both employer-provided compensation and tip compensation is considered. He contends that the summary statement language is misleading about this fact. He maintains that the summary should explain that the proposed initiative will "increase the minimum *employer-paid* wage for tipped employees to 60 [percent] of the state minimum wage."

 In contrast, the secretary of state asserts that her summary statement was fair and sufficient considering the limited word count available to explain the complex issues of how the proposed minimum wage initiative would impact wages of tipped workers. The trial court agreed

with the secretary of state's assertions, finding that the summary statement reference to tipped-worker wages was accurate and fairly summarized the proposed initiative. The trial court declared that Allred's arguments suggested a need for a "level of detail [that] could not and need not be provided" to render a summary fair and sufficient. This Court finds no error in the trial court's reasoning on this issue. As noted in discussing the tobacco tax initiative, the secretary of state's summary statement "need not set out the details of the proposal" to be fair and sufficient. *Cf. United Gamefowl Breeders*, 19 S.W.3d at 141.

Finally, Allred argues that the summary statement is unfair and insufficient because it fails to explain adequately and accurately how the proposed minimum wage initiative would result in state minimum wage adjustments based on changes to the federal minimum wage. He contends that the summary statement fails to explain to voters that the proposed initiative would create a new "super-escalator" scheme whereby Missouri's state minimum wage would be increased to meet the federal minimum wage if the federal minimum wage is higher and then still be subject to increases based on the application of the CPI. He argues that voters are not informed fully by the summary statement that it is likely under the proposed measure that the state's minimum wage will increase annually.

██ The secretary of state responds that her summary statement accurately states the effects of the proposed initiative within the 100–word limit imposed for the summary statement. She argues that setting out a separate explanation of the "super-escalator" provision was not necessary to render the summary statement fair and

sufficient. This Court agrees, as the summary statement "need not set out the details of the proposal" to be fair and sufficient. *Cf. United Gamefowl Breeders*, 19 S.W.3d at 141. As noted above, the test is not whether increased specificity would be have been preferable but instead is whether the language used was fair and impartial in summarizing the initiative's purposes. *See Missourians Against Human Cloning*, 190 S.W.3d at 457.

For these reasons, this Court finds that the trial court did not err in upholding the secretary of state's summary statement for the minimum wage initiative. The trial court's judgment is affirmed on this issue.

## 2. The minimum wage initiative fiscal note and fiscal note summary were fair and sufficient

Allred's appeal also contests the fairness and sufficiency of the auditor's fiscal note and fiscal note summary for the minimum wage initiative. The fiscal note summary at issue states:

Increased state and local government wage and benefit costs resulting from this proposal will exceed $1 million annually. State government income and sales tax revenue could increase by an estimated $14.4 million annually; however, business employment decisions will impact any potential change in revenue. Local government revenue will change by an unknown amount.

Allred argues that this fiscal note summary and the underlying fiscal note are insufficient and unfair because they fail to give a real assessment or estimate of the direct costs that state and local governmental entities will bear if the minimum wage initiative is passed. He criticizes at length the auditor's process for creating the fiscal note and fiscal note summary.[17]

---

**17.** When creating the fiscal note and fiscal note summary for the minimum wage initia-

He particularly complains that the auditor accepted the initiative proponent's fiscal impact assessment report even though it was filed after the statutory time deadline. Allred calls the auditor's work creating the fiscal note summary "mere guesswork," which he argues cannot produce a fair and sufficient summary of the costs of the proposed measure. He further argues that the fiscal note summary is insufficient because it misstates likely indirect impacts of the proposed initiative. Allred contends that the fiscal note summary should have provided more information about the initiative's potential impacts on businesses' spending and investments.

In rejecting Allred's arguments about the unfairness and insufficiency of the fiscal note and fiscal note summary, the trial court highlighted that the auditor's process for creating the fiscal note and fiscal note summary has been upheld repeatedly by the court of appeals.[18] Particularly, the trial court highlighted that the auditor incorporated the fiscal impact submissions essentially verbatim when creating the fiscal note. It also noted that the fiscal note summary at issue for the minimum wage initiative reflected statements that were included verbatim in the fiscal note. The trial court stressed that much of the fiscal

note and fiscal note summary creation process was left to the auditor's discretion and should not be subjected to "partisan wrang[ling]" in litigation.

 Despite Allred's assertions, this Court agrees with the trial court that the fiscal note and fiscal note summary for the minimum wage initiative are fair and sufficient. The fiscal note summary meets its purpose of informing the public about the proposed initiative's potential fiscal consequences. *See* sec. 116.175.1. And it does so without using language that is likely to cause bias, prejudice, deception, or favoritism for or against the proposal. *See Missouri Mun. League*, 364 S.W.3d at 557. The fiscal note is required to be sufficient and fair, and it can be considered meaningful, sufficient, and fair even if it does not use the "best" language, set out all details of the proposed measure, or inform voters of an express amount of potential costs of the initiative. *See id.*

This Court finds no error in the trial court's holding that the minimum wage initiative's fiscal note and fiscal note summary were fair and sufficient and affirms the trial court's judgment on this issue.

## C. The Payday Loan Initiative

The Northcott, Francis, Prentzler, and

---

tive, the auditor received fiscal impact assessments from 21 state government entities and seven local government entities. A fiscal impact report also was filed on behalf of the initiative proponent (Missouri Jobs with Justice), but no opponent of the proposed initiative made a fiscal impact submission to the auditor.

The fiscal impact submissions of governmental entities were reviewed for completeness and reasonableness, as were the numbers and calculations submitted in the Missouri Jobs with Justice fiscal impact submission. Consistent with the auditor's office normal procedures, the fiscal note for the minimum wage initiative was prepared using the submissions essentially "verbatim."

18. At trial, the court heard testimony regarding the auditor's process for preparing the fiscal note and fiscal note summary for the proposed minimum wage initiative. Two expert witnesses also testified. Allred presented the testimony of a labor economist, Dr. David Macpherson, who is opposed to the minimum wage. Dr. Macpherson suggested that the auditor's methods led to an inaccurate fiscal impact assessment. Missouri Jobs with Justice presented the testimony of an economics professor, Dr. Michael Kelsay, who opined that the contents of the auditor's fiscal note submissions and the fiscal note's included assumptions that were conservative and reasonable.

Reuter appeals [19] raise issues regarding the fairness and sufficiency of the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary that were prepared for the proposed payday loan initiative. The trial court agreed with the initiative's opponents that the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary were insufficient and unfair and likely would deceive petition signers and voters. The judgment was appealed in each of the four suits.

## 1. The payday loan initiative summary statement was fair and sufficient

The proposed payday loan initiative would limit the annual percentage rate for payday, title, installment, and other high-cost consumer credit and small loans to 36 percent per year.[20] The proposed initiative's language includes that it is aimed at "[p]reserving fair lending by prohibiting lenders from structuring other transactions to avoid the rate limit through subterfuge." The secretary of state prepared this summary statement for the proposed payday loan initiative:

> Shall Missouri law be amended to limit the annual rate of interests, fees, and finance charges for payday, title, installment, and consumer credit loans and prohibit such lenders from using other transactions to avoid the rate limit?

**19.** The four lawsuits were tried in a single hearing on a single record. Although they were not consolidated by the trial court or this Court, they are addressed collectively in this opinion.

**20.** The 36–percent rate cap reflects the rate limitation that is currently in place for military families under 10 U.S.C. section 987. The initiative would amend chapters 367 and 408, and its proposed new language for section 408.100.1 provides in part:

> It is the intent of the people of Missouri to prevent lenders, such as those who make

The trial court found that the summary statement's suggestion that the initiative would "limit the annual rate of interest" was not specific enough to render the summary statement fair and sufficient. Noting federal truth in lending provisions, the trial court found that the summary statement should have provided the specific 36–percent interest rate limit proposed by the initiative. It concluded that the omission of the 36–percent rate limit made the statement "misleading and likely to deceive petition signers and voters." It opined: "as a matter of both law and fact, the initiative's impact—i.e. its 'probable effect'—on businesses, consumers, and governmental entities, is not tied to the mere *existence* of a 'limit,' but rather, it depends on *what* that 'limit' is." Citing *Cures Without Cloning v. Pund,* 259 S.W.3d 76 (Mo.App.2008), the court found that it "must rewrite" the summary statement "to correct [the statement's] insufficiency and unfairness," and it decided it would "add in the essential [36–percent] limitation." [21] The court amended the summary statement to provide:

> Shall Missouri law be amended to allow annual rates up to a limit of 36 [percent] including interests, fees, and finance charges for payday, title, installment, and consumer credit loans and prohibit such lenders from using other transactions to avoid the rate limit?

> what are commonly known as payday loans, car title loans, and installment loans, which have typically carried triple-digit interest rates as high as [300] percent annually or higher, from charging excessive fees and interest rates that can lead families into a cycle of debt.

**21.** In *Cures Without Cloning,* the court of appeals discussed the authority a court has to rewrite a summary statement that it finds is insufficient or unfair. 259 S.W.3d at 82–83.

The appeals from this judgment allege that the trial court erred in finding that the secretary of state's summary statement language was insufficient or unfair. The appellants assert that the original summary statement was not deceiving or misleading, was not required to include specificity about the rate cap to be fair and sufficient, and should not have been rewritten by the trial court.

 This Court finds that the trial court's judgment on this issue was in error, as the summary statement prepared by the secretary of state was fair and sufficient as it originally was prepared. Section 116.334 imposes the requirement that the secretary of state's summary statement be prepared to be "neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure." It is not the role of the courts to reject the secretary of state's summary statement when it "fairly and impartially summarizes the purpose of the initiative so that the voters will not be misled." *See Missouri Mun. League,* 364 S.W.3d at 553 (internal quotations omitted).

Here, the secretary of state prepared a summary statement that was accurate as to the purpose of the initiative—to limit the permissible interest rate for certain types of loans—and there was no requirement to articulate specifically the proposed 36–percent rate limit. That the court might believe that the additional information about the rate limit would render a better summary is not the test. *See Bergman v. Mills,* 988 S.W.2d 84, 92 (Mo.App.

1999) (rejecting claims by an initiative's opponents who alleged that the secretary of state's summary statement for the initiative was vague, ambiguous, and insufficient; finding that "even if the language proposed by [the opponents] is more specific, and even if that level of specificity might be preferable, whether the summary statement prepared by the Secretary of State is the best language for describing the referendum is not the test").

Because the secretary of state's summary statement language was fair and sufficient in summarizing the purpose of the initiative and was not written in a way that would mislead voters, the trial court erred in rejecting her summary statement. There was no reason for the trial court to declare that the secretary of state's summary statement could not be used and to rewrite her summary. The judgment in the payday loan initiative cases is reversed on this issue.

## 2. The payday loan initiative fiscal note and fiscal note summary were fair and sufficient

The payday loan initiative proponents also appeal the trial court's finding that the auditor's fiscal note and fiscal note summary for the proposed payday loan initiative were unfair and insufficient. According to the auditor's standard practices, the fiscal note created for the proposed initiative was essentially a verbatim reflection of the fiscal impact submissions that the auditor received regarding the measure.[22] The auditor's fiscal note summary

---

**22.** Included in the fiscal impact submissions returned to the auditor during his preparation of the payday loan initiative fiscal note, the department of insurance, financial institutions and professional registration reported that it anticipated no costs or savings to that department associated with the proposed initiative. The department of revenue also indicated it

believed that that the initiative would have no impact on that department.

When gathering information for preparing the fiscal note, the auditor also received a proposed fiscal impact statement from an economics professor who is an opponent of the proposed measure. The professor's opinion was that the proposed initiative would

for the proposed payday loan initiative provided:

> State governmental entities could have annual lost revenue estimated at $2.5 to $3.5 million that could be partially offset by expenditure reductions for monitoring industry compliance. Local governmental entities could have unknown total lost revenue related to business license or other business operating fees if the proposal results in business closures.

In exploring the fairness and sufficiency of this fiscal note summary at trial, testimony was received from two economics experts. One economics professor testified about the negative fiscal impact that the proposed initiative would have on title loan and payday loan lenders. He also testified regarding the proposed payday loan initiative's likely fiscal impacts related to increased unemployment compensation payouts and lost licensing-fee revenues. The evidence showed that the auditor's office believed that the assumptions were correct that the proposed initiative would cause businesses to close.

The auditor staffer who prepared the fiscal note and fiscal note summary testified that the $2.5– to $3.5–million lost revenue estimate referenced in the fiscal note summary was derived from the figures submitted in the economic professor's fiscal impact submission. He testified, however, that he did not include the professor's prediction regarding lost unemployment benefits because those are

not funded through a government fund. Testimony at trial also focused on the initiative's impact on local government tax receipts, and the auditor admitted that no "local impact" assessment was included in the fiscal note or fiscal note summary.

Testimony at trial further explored a reference to "510 lenders" that had been included in the fiscal note because it was included in the professor's report via an email from the division of finance.[23] The auditor's office did not follow up to determine why the department of insurance's "no cost or savings to the department" response to the auditor's direct inquiry regarding the fiscal impact of the initiative was contrary to the division of finance's email in the professor's report. The auditor's staffer who prepared the fiscal note testified that he considered the division of finance's comments about the impact on "510 lenders" to have been evaluated and modified in the official fiscal impact report that the auditor received from the department of insurance. The auditor's office did not undertake an independent analysis to determine the fiscal impact of the initiative on "510 lenders," and the professor's analysis of the fiscal impact did not address the fiscal impact on "510 lenders." Accordingly, the fiscal note and fiscal note summary did not reflect a potential fiscal impact that the payday loan initiative would have on "510 lenders." The auditor's staffer testified that he speculated

---

cause payday and title loan lenders to go out of business, resulting in a loss to state and local government revenues, increased costs in unemployment insurance, and lost licensing-fee revenues.

Based on the information received, the auditor's office prepared a 14–page fiscal note, which included the information received regarding the initiative "verbatim."

**23.** Although the department of insurance, financial institutions and professional registra-

tion had not indicated a negative impact from the initiative in its response to the auditor's inquiry, a contrary email message from its division of finance was attached in the professor's fiscal impact report. The division of finance email indicated that the proposed initiative would put payday and title loan lenders out of business and would put about half of "510 lenders" out of business. "510 lenders" are lenders who largely are involved in financing consumer purchases.

that the department of insurance had reasoned that any lost revenues impact of the payday loan initiative would be offset by the department spending smaller amounts to regulate the lending entities at issue.

An economist testified at trial that he had been retained by opponents' counsel to provide information at trial about the proposed initiative's impact to "510 lenders." He testified that the proposed initiative would result in "510 lenders" losing around 60 percent in revenues and would likely lead to the disappearance of Missouri's "510 lenders." He opined that the impact on those lenders would lead to declines in state sales tax revenues and personal and business income tax revenues, and he also projected it would lead to increased unemployment compensation payments for laid-off employees of "510 lenders." The economist admitted, however, that his trial testimony evidenced fiscal impact information on "510 lenders" that was not provided to the auditor during the time the auditor was preparing the fiscal note and fiscal note summary.

After hearing the evidence, the trial court concluded that the "undisputed facts" showed that the payday loan initiative's fiscal note and fiscal note summary were "defective." It criticized that the auditor's fiscal note summary did not reflect the fiscal impact that the payday loan initiative would have on lenders classified as "510 lenders." It noted that the initiative opponents' experts had provided evidence that "510 lenders" would be impacted negatively by the initiative, which would cause businesses to close and the state to lose revenues. The trial court believed it would deceive voters not to reflect information about "510 lenders" in the fiscal note and fiscal note summary.[24]

The appeals from this judgment argue that the trial court erred in concluding that the fiscal note and fiscal note summary were insufficient and unfair. They assert that there was substantial and competent evidence to support the auditor's fiscal note because it fully, completely, and accurately listed and summarized all the fiscal comments the auditor received during the statutory period under section 116.175. They criticize that the trial court's judgment focused on "510 lender" evidence—particularly from the economist—that was unavailable to the auditor when the fiscal note and fiscal note summary were prepared. They assert that the opponents to the initiative failed to provide evidence identifying that any lender that would be affected by the proposal was not already considered in the auditor's fiscal note and fiscal note summary.

■ This Court agrees that the trial court erred in rejecting the auditor's fiscal note and fiscal note summary for the proposed payday loan initiative. Contrary to the arguments of the initiative opponents, the fiscal note and fiscal note summary complied with the auditor's obligations to create a fair and sufficient summary and inform the public of the fiscal consequences of the proposed measure without bias, prejudice, deception, or favoritism. *See Missouri Mun. League*, 364 S.W.3d at 557. The auditor did nothing out of his ordinary practice when incorporating verbatim the fiscal impact submissions that were returned to him, and the initiative opponents are unpersuasive in suggesting that the auditor should have undertaken additional examinations of the fiscal im-

24. Pursuant to section 116.190.4, the trial court remanded the fiscal note and fiscal note summary to the state auditor for preparation of a new fiscal note and fiscal note summary. Pending the appeals addressed in this consolidated opinion, no new fiscal note or official ballot title has yet been prepared for any of the initiatives at issue in these cases.

pacts that the initiative would have specifically on "510 lenders." While it might have been more informative to have had additional information related to the likely fiscal impact of the initiative on "510 lenders," nothing required the auditor to look beyond the information he was provided in assessing the fiscal impact on those lenders. As noted earlier in this opinion: "The auditor is not required to compel and second-guess reasonable submissions from entities but is able to rely on the responses submitted.... [And][i]t is not the auditor's role to choose a winner ... by independently researching the issue himself, double-checking economic theories and assumptions, and adopting one side's view over another's in the resulting fiscal note." Further, courts must remain mindful that the word limitations of the fiscal note summary necessarily result in exclusion of specific fiscal impact details that might improve the summary but that are not required for it to be upheld as sufficient and fair.

This Court reverses the trial court's judgment in the payday loan initiative cases with respect to its finding that the fiscal note and fiscal note summary were unfair and insufficient. Further, there was no bar to incorporating the auditor's fiscal note summary in the ballot title.

### 3. The trial court's ripeness holdings are affirmed

In *Francis*, plaintiffs Francis and Hoover additionally argued that the trial court should declare that the payday loan initiative is disqualified as a violation of the uniform lender interest rate requirements of Mo. Const. art. III, sec. 44. They also asserted that the initiative was invalid because it was void for vagueness and violative of due process. The trial court dismissed these claims as unripe. In *Francis,* the opponents of the initiative

cross-appeal the trial court's judgment to assert that the trial court erred in finding that these additional constitutional claims were unripe. They argue that an exception to the ripeness doctrine applies. They also contend that the trial court erred in dismissing their constitutional claims as unripe because it would force taxpayers to bear the burden and expense of holding an election on a facially unconstitutional initiative.

This Court affirms the trial court's judgment on these issues without further discussion, as an opinion on this matter would not have precedential value. Rule 84.16(b).

### 4. The intervention challenge is moot

Also at issue in the payday loan initiative cases is whether two proponents and financial backers of the proposed payday loan initiative should be allowed to intervene in the case. George Dennis Shull and Jerry Stockman ("Intervenors") are citizens, residents, legal voters, and taxpayers of the State of Missouri who supported all four of the payday loan initiative petitions. Intervenors have donated money and volunteered their time in working to ensure the initiative petitions are placed on the ballot.

When these ballot title challenges were filed, Intervenors sought to intervene as a matter of right or, alternatively, through permissive intervention. Initially, Intervenors sought to intervene in the Prentzler suit. In October 2011, the trial court granted Intervenors' motion for permissive intervention in the Prentzler suit and likewise in the Reuter suit in December 2011. In November 2011, Intervenors filed another motion to intervene as a matter of right in the Northcott and Francis suits. Intervenors also requested that the trial court change its ruling in the Prentzler and Reuter suits from a finding that they

could intervene permissively to a determination that they could intervene as a matter of right. Intervenors filed suggestions in support of their motions, along with affidavits and supporting documents.

After hearing arguments about the issue and accepting all of the factual allegations set forth in the affidavits as true, the trial court entered a final judgment regarding intervention in each of the four lawsuits. The trial court found Intervenors sought to defend the ballot title and fiscal note in the exact form as they were issued and approved by the secretary of state and the auditor. Therefore, the trial court held Intervenors failed to show how their interests would not be protected by those officials. The trial court denied Intervenors' motion to intervene in the Northcott and Francis suits and dismissed them as parties from the Reuter and Prentzler suits. Intervenors were permitted to participate as amicus curiae and file briefs consistent with that status. The trial court certified the judgment as final for purposes of appeal.

Intervenors appealed, asserting the trial court erred in denying their motions to intervene as a matter of right because they were entitled to intervene pursuant to Rule 52.12(a). The court of appeals affirmed the trial court's judgment, finding Intervenors failed to establish, as mere supporters and signatories of an initiative petition, that they had a sufficient interest in the underlying section 116.190 actions. *Prentzler v. Carnahan,* 366 S.W.3d 557, 561 (Mo.App.2012). The court of appeals explained, "Given that the limited purpose of ballot initiative challenges is to ensure the fairness and sufficiency of ballot titles and fiscal notes, [Intervenors] proposed interests in having their signatures count and qualifying the initiative for the ballot are not at issue in the underlying litigation." *Id.* at 562. Therefore, Intervenors

had no direct or immediate interest in the underlying matter of the litigation and could not demonstrate how the outcome of the cases would cause them to incur any legal liability or directly affect their legal rights as supporters of the initiative. *Id.* at 564. Further, the court of appeals found Intervenors were not assured the right to have their signatures counted, outlining several scenarios wherein Intervenors' signatures could be invalidated or disregarded. Because Intervenors had no control over whether their signatures would be counted for purposes of qualifying the initiative petition, their claimed interest was deemed too remote or attenuated for purposes of intervention as a matter of right. *Id.* at 562–63. The court also dismissed Intervenors' argument that the secretary of state and the auditor could not represent their interests adequately, finding the argument inconsequential because of their failure to establish they had a sufficient interest in the litigation. *Id.* at 564.

Intervenors did not seeking rehearing or transfer of the court of appeals' decision regarding their claim to intervene as a matter of right. Instead, Intervenors continued to participate in all four lawsuits as amicus curiae, offering both oral argument and briefing on all of the factual and legal issues. After the circuit court issued its final judgment, Intervenors appealed to this Court, arguing their entitlement to permissive intervention.

In their sole point on appeal, Intervenors argue the circuit court erred in overruling their motions for permissive intervention because the uncontroverted facts demonstrate they met the requirements for permissive intervention. Specifically, they aver that they have unique interests that are not shared by the secretary of state or the auditor and that they have no alternative means of defending the initia-

tive petition other than through intervention.

This Court's judgment renders Intervenors' argument moot because they have received the relief they ultimately sought by way of their motions to intervene; that is, to support the payday loan initiative and ensure it is placed on the November 2012 ballot.

## IV. Conclusion

### A. The Tobacco Tax Initiative

In the tobacco tax initiative case, the trial court properly concluded that the auditor's statutory duties under section 116.175 do not render that statute unconstitutional under Mo. Const. art. IV, sec. 13. It also correctly upheld the fairness and sufficiency of the secretary of state's summary statement and the auditor's fiscal note and fiscal note summary for the proposed tobacco tax initiative. The trial court additionally did not err in rejecting the plaintiff's assertions of *res judicata* as to the constitutional issue. The trial court's judgment in the tobacco tax initiative case is affirmed.

### B. The Minimum Wage Initiative

In the minimum wage initiative case, the trial court erred in finding that section 116.175 is unconstitutional, and its decision is reversed as to that issue. The trial court, however, did not err in upholding the fairness and sufficiency of the secretary of state's summary statement or the auditor's fiscal note and fiscal note summary for the proposed minimum wage initiative. The trial court's judgment entered in the minimum wage initiative case is affirmed in part and reversed in part.

### C. The Payday Loan Initiative

In the payday loan initiative cases, the trial court erred in finding the secretary of state's initiative summary statement unfair and insufficient. It also erred in finding the auditor's fiscal note and fiscal note summary unfair and insufficient. The trial court's judgment is reversed as to these issues. This Court affirms, however, the trial court's judgment as to its other challenged holdings regarding certain constitutional arguments that were raised by the plaintiffs in the payday loan initiative cases. The intervention challenge raised in this case is moot. The trial court's judgment in the payday loan initiative cases is affirmed in part and reversed in part.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, STITH, PRICE, and DRAPER, JJ., concur.

FISCHER, J., concurs in result and concurs in separate opinion filed.

ZEL M. FISCHER, Judge.

I concur with the principal opinion and would allow the ballot initiatives to be placed on the ballot. In my view, the secretary of state's summary and the auditor's fiscal note and fiscal note summaries are fair and sufficient as these terms have been defined by prior case decisions. "Fair" and "sufficient" have been defined in a manner that gives discretion to these elected officials, and elections have consequences.

"When courts are called upon to intervene in the initiative process, they must act with restraint, trepidation, and a healthy suspicion of the partisan who would use the judiciary to prevent the initiative process from taking its course." *Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. banc 1990). "Judicial intervention is not an appropriate substitute for the give and take of the political process." *State ex rel.*

*Humane Soc'y of Mo. v. Beetem,* 317 S.W.3d 669, 674 (Mo.App.2010).

I agree with the auditor that the fiscal impact of proposed statutory and constitutional provisions is an important consideration for voters in deciding to vote for or against a proposed measure. However, in my view, section 116.175 [1] is an unconstitutional expansion of the auditor's duties in contravention of the express limitations placed on the auditor by article IV, section 13, of the Missouri Constitution. This view is based on the plain language of article IV, section 13, and the historical context in which it was adopted. Additionally, fiscal note summaries are not required or, for that matter, even implied by article III, sections 49 [2] and 50 [3] of the Missouri Constitution. Therefore, I would not include the auditor's fiscal note summaries on the ballot titles with the proposed initiatives.

**Standard of Review**

This Court reviews the constitutional validity of a statute *de novo. Gurley v. Mo. Bd. of Private Investigator Exam'rs,* 361 S.W.3d 406, 411 (Mo. banc 2012). "A statute is presumed valid and will not be held unconstitutional unless it clearly contravenes a constitutional provision." *In re Brasch,* 332 S.W.3d 115, 119 (Mo. banc 2011). "The person challenging the statute's validity bears the burden of proving the act clearly and undoubtedly violates the constitution." *Kansas City Premier Apartments, Inc. v. Mo. Real Estate Comm'n,* 344 S.W.3d 160, 167 (Mo. banc 2011) (quoting *Brasch,* 332 S.W.3d at 119). "But, if all or part of a statute does conflict with a constitutional provision or provisions, this Court must hold the conflicting portions invalid." *Farmer v. Kinder,* 89 S.W.3d 447, 452 (Mo. banc 2002).

"While a court will read a constitutional provision broadly, it cannot ascribe to it a meaning that is contrary to that clearly intended by the drafters." *Id.* "Rather, a court must undertake to ascribe to the words of a constitutional provision the meaning that the people understood them to have when the provision was adopted." *Id.* "The meaning conveyed to the voters is presumptively the ordinary and usual meaning given the words of the provision." *Id.* "Of particular importance is the principle that in determining [the] meaning of a constitutional provision due regard will be given to [its] primary objects and all related provisions should be construed as a

---

1. All references to § 116.175 are to RSMo Supp.2011.

2. Mo. Const. art. III, sec. 49, provides:

 The people reserve power to propose and enact or reject laws and amendments to the constitution by the initiative, independent of the general assembly, and also reserve power to approve or reject by referendum any act of the general assembly, except as hereinafter provided.

3. Mo. Const. art. III, sec. 50, provides:

 Initiative petitions proposing amendments to the constitution shall be signed by eight percent of the legal voters in each of two-thirds of the congressional districts in the state, and petitions proposing laws shall be signed by five percent of such voters. Every such petition shall be filed with the secretary of state not less than six months before the election and shall contain an enacting clause and the full text of the measure. Petitions for constitutional amendments shall not contain more than one amended and revised article of this constitution, or one new article which shall not contain more than one subject and matters properly connected therewith, and the enacting clause thereof shall be "Be it resolved by the people of the state of Missouri that the Constitution be amended:". Petitions for laws shall contain not more than one subject which shall be expressed clearly in the title, and the enacting clause thereof shall be "Be it enacted by the people of the state of Missouri:".

whole and where necessary to bring conflicts, if any, into harmony." *State, at Info. of Martin v. City of Independence,* 518 S.W.2d 63, 66 (Mo.1974). "A court may not add words by implication when the plain language is clear and unambiguous." *Wright–Jones v. Nasheed,* 368 S.W.3d 157, 159 (Mo. banc 2012).

## Analysis

Article IV, section 13, of the Missouri Constitution provides:

> The state auditor shall have the same qualifications as the governor. He [or she] shall establish appropriate systems of accounting for all public officials of the state, post-audit the accounts of all state agencies and audit the treasury at least once annually. He [or she] shall make all other audits and investigations required by law, and shall make an annual report to the governor and general assembly. He [or she] shall establish appropriate systems of accounting for the political subdivisions of the state, supervise their budgeting systems, and audit their accounts as provided by law. *No duty shall be imposed on him [or her] by law which is not related to the supervising and auditing of the receipt and expenditure of public funds.*

(Emphasis added). This limiting provision reaffirms that the people, in adopting the 1945 Constitution, placed express limitations of authority on certain statewide elected officials, including the auditor, because, under the 1875 Constitution, the legislature had expanded government by giving elected officials new functions and duties to build up their power by patronage. This Court has previously addressed the purpose of these limiting provisions included in the 1945 Missouri Constitution.

Just as article IV, section 15 sets limits on the power of the treasurer, so article IV, section 13 provides: "[N]o duty shall be imposed on [the state auditor] by law which is not related to the supervising and auditing of the receipt and expenditure of public funds." Article IV, section 14 similarly provides "no duty shall be imposed on [the secretary of state] by law which is not related to his duties as prescribed in this constitution." There were no similar limitations in the 1875 Constitution, and this Court has previously recognized that it was to correct this situation that these limiting provisions were added to the 1945 constitution, for:

> the background of the 1945 provision lies in the prior history of a building up of the power and patronage of elected officials by giving to them new functions and duties. One purpose of the new constitution was to limit and define the scope and duties of all executive officials (see § 12, Art. 4,) agencies, and departments, including elected officials.

*Petition of Board of Public Buildings,* 363 S.W.2d 598, 608 (Mo. banc 1962).

Indeed, the 1944 debates over the 1945 constitution themselves show that the delegates to the constitutional convention drafted it with an eye towards their concern that power had been too widely distributed among a variety of elected officials under the 1875 constitution and that a focusing of more executive power in the office of the governor and his or her appointees might lead to more effective government. One way the 1945 constitution sought to accomplish this goal was by precluding the expansion of the state treasurer's role beyond that of custodian of state funds and by similarly limiting the power of the state auditor and secretary of state. *See* DEBATES, MISSOURI CONSTITUTIONAL CONVENTION 1945, vol. 13, 4127–4135; vol. 14, 4171–4173.

*Farmer v. Kinder,* 89 S.W.3d 447, 453–54 (Mo. banc 2002).

As the principal opinion correctly points out, the auditor's authority to prepare fiscal notes and fiscal note summaries for "proposed measures" was enacted by the legislature after this Court's decision in *Thompson v. Comm. on Legislative Research,* 932 S.W.2d 392, 395 (Mo. banc 1996), held that "section 116.170.2, RSMo 1994 violated the constitution" because "the legislature had no power to adopt a statute" that "increased the duties of the committee beyond those expressly authorized by" the Missouri Constitution. Op. at 648. In my view, the same analysis would apply to the auditor, and the legislature had no power to enact a statute that increased the duties of the auditor beyond those expressly authorized by the Missouri Constitution.

The principal opinion seeks to define the auditor's process in preparing the fiscal note and fiscal note summary as an "investigation" under article IV, section 13, and that "[t]here is a relationship between the auditor's preparation of the fiscal notes and fiscal note summaries and the 'supervising ... of the receipt and expenditure of public funds.'" op. at 652. I disagree with this expansive interpretation because the solicitation and recitation of potential costs and benefits of petition initiatives that are merely hypothetical in nature at the time they are submitted to the auditor for the preparation of fiscal notes and fiscal note summaries do not "relate" to "supervis[ion] ... of the *receipt and expenditure* of public funds."

To "supervise" means "to look over in order to read ... to coordinate, direct, and inspect continuously and at first hand the accomplishment of: oversee with the powers of direction and decision the implementation of one's own or another's intentions[.]" WEBSTER'S THIRD NEW INT'L DICTIONARY UNABRIDGED 2296 (1976). "Receive" means "to take possession or delivery of ... to take in: act as a receptacle or container for...." *Id.* at 1894. "Receipt" means "the act or process of receiving...." *Id.* "Expend" means "to pay out or distribute ... to consume by use: use up...." *Id.* at 799. "Expenditure" means "the act or process of expending...." *Id.* at 800. The statutory requirement directing the auditor's office to solicit information to provide a fiscal note and fiscal note summary pursuant to § 116.175, RSMo Supp.2011, does not relate to the "act or process," "with powers of direction and decision," either the auditor's taking "possession or delivery of" or "pay[ing] out or distribut[ing]" public funds.

In the case of *Brown v. Carnahan, et al.,* the circuit court below reasoned:

It is undisputed that the preparation of the fiscal note and fiscal note summary involves estimating costs and savings for a proposed measure, not a review of monies received and spent. Estimating by its very nature is forecasting what might happen, not what has happened. The plain language of the constitution contemplates that whatever duty the state auditor is given, it must be related to the receipt and expenditure of public funds. Estimated costs or savings have neither been expended nor realized. One can neither supervise nor audit funds which have not been received or expended because at that point, there is nothing to look at. The State Auditor argues that being "related to" infers some sort of logical connection between the preparation of the fiscal note and the supervising and auditing of the receipt and expenditure of public funds.

This Court declines to find such logical connection simply because the discussion relates to public funds. The del-

egation to the State Auditor of the duty to prepare a fiscal note and summary provided by § 116.175, RSMo, violates the limitations of Article IV, § 13 of the Missouri Constitution and those provisions are found to be unconstitutional.

The mere fact that the auditor's preparation of a fiscal note and fiscal note summary is tangentially related to "public funds" does not escape the limiting provision of article IV, section 13, requiring that such a duty be "related to the supervising ... of the receipt and expenditure of public funds." While the principal opinion rationalizes that the auditor's power to conduct investigations as required by law is silent with respect to time restrictions, the plain and ordinary meaning of the words of the limiting provision in article IV, section 13, indicate a requirement that the auditor's duties relate to the "act or process of" receiving or expending public funds. Such an "act or process" is expressly a concurrent one. The preparation of a fiscal note and fiscal note summary, for inclusion in a ballot initiative petition, does not relate to the "act or process" of receiving or expending public funds. The limiting provisions were added in 1945 specifically to the offices of the treasurer, the auditor, and the secretary of state to eliminate precisely this kind of additional legislative directive from the General Assembly to an office of the executive branch. *Farmer,* 89 S.W.3d at 454. "The language of this clause is susceptible to a clear and unambiguous interpretation based only on the plain and ordinary meaning of the words." *Wright–Jones,* 368 S.W.3d 157, 159. "A court may not add words by impli-

cation when the plain language is clear and unambiguous." *Id.*

The initiative referendum is a powerful tool of direct democracy. "In fact, the initiative allows the public to bypass their elected representatives and reserves direct lawmaking power with the voters of the state." [4] "The initiative is a tool for everyday, ordinary citizens to 'override legislatures held in [the] thrall of wealthy patrons." [5] Initiative and referendum make it possible for the people, by direct vote, to repeal "bad laws" or enact beneficial measures that their representatives refuse to consider.[6]

Nothing in article III, sections 49 and 50, requires the inclusion of a fiscal note or fiscal note summary in an initiative petition proposing laws or amendments to the constitution. Furthermore, the initiative process is a form of direct democracy that presumes the supporters for or against the ballot measure, who will rigorously campaign to support or defeat it, are left with the responsibility to advise the voters of its potential fiscal impact.

### Conclusion

Because I would find that § 116.175 imposes duties on the state auditor that are not related to "supervising ... the receipt and expenditure of public funds," in contravention of article IV, section 13, I would not include the auditor's fiscal note summaries in the official ballot titles for the proposed initiatives at issue in this case. However, I would allow the initiative petitions to be placed on the ballot without

4. Heather A. Paraino, *Missouri's Silenced Citizen Legislators: How the Initiative Denied to Citizens in Fourth–Class Missouri Municipalities,* 44 St. Louis U. L.J. 1081, 1083–84 (1997).

5. *Id.* at 1087.

6. David L. Callies, Nancy C. Neuffer, and Carlito P. Caliboso, *Ballot Box Zoning: Initiative, Referendum and the Law,* 39 WASH. U.J. URB. & CONTEMP. L. 53, 58 (1991).

fiscal note summaries. In all other respects, I concur with the principal opinion.